[Cite as *State v. Clinton*, 2024-Ohio-4720.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                           Court of Appeals No.  E-21-053

      Appellee                                     Trial Court No.  2012 CR 383

v.

 Curtis L. Clinton                                    **DECISION AND JUDGMENT**

      Appellant                                    Decided:  September 27, 2024

\* \* \* \* \*

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Stephen E. Maher, Special Assistant Prosecuting Attorney, for appellee.

Kimberly S. Rigby and Michelle Umana for appellant.

\* \* \* \* \*

**OSOWIK, J.**

## I.  INTRODUCTION

{¶ 1} Appellant, Curtis Clinton, appeals the October 26, 2021 judgment of the Erie County Court of Common Pleas, dismissing his timely-filed R.C. 2953.21 petition for postconviction relief without an evidentiary hearing.  Clinton appeals the dismissal of all 66 grounds for relief, which assert a variety of ineffective assistance of counsel and due process claims.

**{¶ 2}** As set forth below, we find that, as to the majority of those claims, the trial court either failed to make *any* findings of fact and conclusions of law, or issued findings and conclusions that lack the specificity required by R.C. 2953.21(D), requiring their remand. Elsewhere, the trial court issued findings and conclusions but applied the wrong legal standard for determining when a hearing is required, under *State v. Bunch*, 2022-Ohio-4723, or whether res judicata applies to bars claims of ineffective assistance of counsel, under *State v. Blanton,* 2022-Ohio-3985. Where the trial court applied the wrong legal standard and where we have also found that Clinton set forth substantive grounds for relief, supported by evidence outside the record, we remand those claims for a hearing. Separately, we also find that the trial court erred in denying Clinton's Crim.R. 42(C) motion for discovery. We remand, with the instruction that the trial court order the prosecution to provide Clinton with the "access" to those materials mandated by that rule.

**{¶ 3}** In sum, we reverse the trial court's judgment, in part, and remand for (1) "access" to certain materials as required by Crim.R. 42(C), and (2) findings of fact and conclusions of law, as required by R.C. 2953.21, with respect to specific grounds for relief ("G/R") identified in this decision, to be followed by (3) a hearing on (a) specific "G/R's" identified in this decision and (b) any other G/Rs that the trial court determines, in its review, also meet the standard for a hearing after issuing the necessary findings of fact and conclusions of law under R.C. 2953.21.

2.

## II. BACKGROUND

{¶ 4} We briefly describe those facts that are relevant to the issues raised in postconviction. For a more thorough description of the facts and evidence offered during Clinton's 2013 trial, see the Ohio Supreme Court's decision affirming Clinton's conviction and death sentence. *State v. Clinton,* 2017-Ohio-9423, ¶ 4-33.

{¶ 5} On September 2, 2012, Clinton raped 17-year-old, E.S., twice, at his Sandusky apartment. During one of the rapes, Clinton choked E.S. until she passed out. E.S. reported the attack and was examined at a hospital. DNA testing of vaginal and anal swabs taken during E.S.'s examination indicated the presence of a DNA profile that was consistent with Clinton's.

{¶ 6} Less than a week after E.S.'s rape, Heather Jackson and her three-year-old daughter, C.J., and one-year old son, W.J., were murdered in their Sandusky home.

{¶ 7} The evidence established that Heather Jackson had multiple visitors to her home on the evening of Friday, September 7, 2012, into the early morning hours on Saturday, September 8, 2012. The state alleged that the murders were committed early Saturday morning.

{¶ 8} On Saturday evening, Jackson's body was found in her bedroom by two friends who entered her home, after hearing that she "was missing." When police arrived, they found Jackson's body wedged between the box spring and mattress in her bedroom with a ligature around her neck. C.J. and W.J. were found behind stacked boxes inside a utility closet. Each child had a ligature around the neck.

3.

{¶ 9} All of the individuals known to have been at Jackson's home before the murders were interviewed and eliminated as suspects. The police were assisted by cell phone records and by surveillance tapes from Firelands Hospital in Sandusky, "which is so close to Jackson's home that its cameras recorded the outside of Jackson's home and the approaching street." *Clinton* at ¶ 17.

{¶ 10} Phone records showed that two of the last calls that Jackson received on September 8, 2012, were from a phone number assigned to Clinton. The first call was received at 3:00 a.m. and lasted 182 seconds. The second call, at 3:12 a.m., lasted 38 seconds. Surveillance video from the hospital showed a white Cadillac arrive at Jackson's home at 3:10 a.m. and departing at 4:16 a.m. The Cadillac returned at 4:20 a.m. and left a minute and a half later. The detective who reviewed the surveillance video, had also investigated the rape of E.S. the week before and knew that Clinton drove a white Cadillac. The police began looking for Clinton.

{¶ 11} On Monday, September 10, 2012, police learned that Clinton had been admitted to Bellevue Hospital the previous day, as a suicidal person. When police arrived, Clinton was being discharged, and he agreed to go with them to the station. During the taped interview with police, which was played at trial, Clinton admitted that he had been to Jackson's apartment early Saturday morning and that they "had sex," but he denied killing Jackson or her children. Clinton was arrested and incarcerated in the county jail.

4.

{¶ 12} While in jail, Clinton called his mother, and excerpts from that conversation were also played for the jury. Clinton made a number of incriminating statements and also expressed his intention to "go in there and plead guilty."

{¶ 13} The coroner testified at trial that all three murder victims died by ligature strangulation and that Heather Jackson's rectum and her daughter C.J.'s rectum were "more open than [they] normally [are] after death." As to C.J. in particular, the coroner testified that, something was in her rectum at "about the time of death." A forensic scientist with BCI testified that seminal fluid was detected on the anal swabs obtained from C.J., and testing performed on a small portion of C.J.'s underwear was also determined to contain a sperm cell. Another BCI witness testified that a mixture of DNA was found on the anal swabs from C.J. The major DNA profile was consistent with C.J.'s and the minor profile was consistent with Clinton's, as was the Y-chromosome profile from that sample. Clinton's DNA was also found on the stain from C.J.'s underwear. Clinton's DNA was also found on swabs from C.J.'s ankles and left wrist, the ligature on W.J., and Heather Jackson's right wrist.

{¶ 14} Following a jury trial in December of 2013, Clinton was convicted of aggravated murder and rape and sentenced to death, which was affirmed on direct appeal. *Id.*

{¶ 15} On November 25, 2014, Clinton filed a petition for post-conviction relief, which he amended, with leave, on March 25 and June 24, 2015. All post-conviction litigation was stayed pending the ruling on the direct appeal. After Clinton's conviction

5.

and sentence were affirmed, on December 19, 2017, Clinton's petition for postconviction relief was stayed for additional periods while he continued his appeal process. The stay was lifted on January 31, 2020. On April 6, 2020, Clinton amended his petition a third time. A comprehensive petition was filed in the trial court on May 10, 2021, and we have relied primarily upon that filing in our review (hereinafter referred to as "the petition.") *See Notice Filed of Withdrawal of Ground for Relief and Partial Withdrawal of Exhibit.* In all, Clinton presented 67 grounds for relief, consisting of a variety of ineffective assistance of counsel and due process claims. Clinton included 83 exhibits in support of his claims.

{¶ 16} The state filed for summary judgment, which Clinton opposed, and both parties filed proposed findings of fact and conclusions of law. By judgment dated October 26, 2021, the trial court rejected all of Clintons claims without holding a hearing. Separately, the trial court also denied Clinton's motions to conduct discovery, which he requested in 2015, pursuant to R.C. 2953.21, and in 2018, pursuant to Crim.R. 42(C). Clinton appealed, raising 16 assignments of error.

> FIRST ASSIGNMENT OF ERROR: The trial court abused its discretion when it applied the doctrine of res judicata to bar Clinton's Grounds for Relief.

> SECOND ASSIGNMENT OF ERROR: The trial court abused its discretion in denying Clinton relief on the grounds that he and his counsel

6.

were denied access to, and discovery of, material exculpatory information possessed by the State, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

THIRD ASSIGNMENT OF ERROR:  The trial court abused its discretion in denying Clinton relief on the ground that he was actually innocent of the offenses for which he is convicted and sentenced to death.

FOURTH ASSIGNMENT OF ERROR:  The trial court abused its discretion in denying Clinton relief on the grounds that his counsel were ineffective to his prejudice during the trial phase of his capital trial.

FIFTH ASSIGNMENT OF ERROR:  The trial court abused its discretion in denying Clinton relief on the grounds that his counsel were ineffective to his prejudice during the mitigation phase of his capital trial.

SIXTH ASSIGNMENT OF ERROR:  The trial court abused its discretion when it denied Clinton's claims that he was denied his right to a fair and impartial jury.

SEVENTH ASSIGNMENT OF ERROR:  The trial court abused its discretion when it denied Clinton relief on the ground that the trial court failed to ensure constitutionally adequate voir dire on race.

7.

EIGHTH ASSIGNMENT OF ERROR: The trial court abused its discretion when it failed to address Clinton's claims that his due process rights were violated by the trial court allowing the consumption of DNA evidence without notifying trial counsel.

NINTH ASSIGNMENT OF ERROR: The trial court erred when it denied Clinton's ground for relief that his due process rights were violated by the trial court allowing the admission of evidence with an undocumented chain of custody.

TENTH ASSIGNMENT OF ERROR: The trial court abused its discretion in denying Clinton's claim that his due process rights were violated when the trial court allowed his involuntary statement to be used as evidence during Clinton's capital trial.

ELEVENTH ASSIGNMENT OF ERROR: The trial court abused its discretion in denying Clinton's claim that the cumulative effect of the State's investigative errors and actions violated Clinton's due process rights.

TWELFTH ASSIGNMENT OF ERROR: The trial court abused its discretion in denying Clinton's claim that his due process rights were violated when the trial court allowed trial counsel to waive Clinton's right

8.

to present mitigation and accepted the waiver at a hearing where Clinton was not present.

THIRTEENTH ASSIGNMENT OF ERROR: The trial court abused its discretion in denying Clinton relief on the grounds that his due process rights were violated when the trial court failed to follow Ohio sentencing law.

FOURTEENTH ASSIGNMENT OF ERROR: The trial court abused its discretion when it denied Clinton's claim that he was prejudiced by the cumulative errors that occurred at his capital trial without providing an evidentiary hearing on his post-conviction petition.

FIFTEENTH ASSIGNMENT OF ERROR: The trial court abused its discretion when it denied Clinton's claim that Ohio's postconviction procedures are constitutionally inadequate.

SIXTEENTH ASSIGNMENT OF ERROR: The trial court erred by denying Clinton's postconviction petition without allowing him to conduct discovery.

## III.  POSTCONVICTION PROCEEDINGS UNDER OHIO LAW

{¶ 17} A postconviction proceeding is a collateral civil attack on a criminal judgment, not an appeal of a criminal conviction. *State v. Calhoun*, 86 Ohio St.3d 279

9.

(1999).  To prevail, the petitioner must establish a violation of his constitutional rights that renders the judgment of conviction void or voidable.  R.C. 2953.21(A)(1)(a).

{¶ 18} In order to grant a hearing on a timely postconviction petition, the trial court must "determine whether there are substantive grounds for relief."  R.C. 2953.21(D).  If the petition "is sufficient on its face to raise an issue that the petitioner's conviction is void or voidable on constitutional grounds, and the claim is one which depends upon factual allegations that cannot be determined by examination of the files and records of the case, the petition states a substantive ground for relief."  *State v. Bunch*, 2022-Ohio-4723, ¶ 23 quoting *State v. Milanovich*, 42 Ohio St.2d 46 (1975), paragraph one of the syllabus.

{¶ 19} To determine whether the petition states a substantive ground for relief, the trial court must consider the entirety of the record from the trial proceedings as well as any evidence filed by the parties in postconviction proceedings.  *Bunch* at ¶ 24 citing R.C. 2953.21(D).  If the record on its face demonstrates that the petitioner is not entitled to relief, then the trial court must dismiss the petition. *Id.* citing R.C. 2953.21(D) and (E).  Conversely, if the record does not on its face disprove the petitioner's claim, then the court is required to "proceed to a prompt hearing on the issues."  *Id.* at ¶ 24; *see also, State v. Hatton*, 2022-Ohio-3991, ¶ 28 ("The defendant is entitled to an evidentiary hearing when the allegations in the motion demonstrate substantive grounds for relief").

10.

## A. Res judicata applies to postconviction relief proceedings.

{¶ 20} The doctrine of res judicata applies to postconviction relief proceedings. *State v. Perry,* 10 Ohio St.2d 175, 179 (1967). The general rule of res judicata is that "a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any [claim] that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment." *Blanton* at ¶ 91, quoting *Perry* at 180. As applied to due process claims in postconviction, "res judicata precludes only those * * * claims that could have been developed during the trial proceedings." *Blanton* at ¶ 93. Thus, if the trial court finds, on the facts of a case, that "the basis for [the petitioner's] due process claim was known to [the petitioner] at the time of trial and could have been fully litigated at that time," the court can summarily dismiss the claim as barred by res judicata." *Id.* at ¶ 28, 94, quoting *State v. Lester*, 41 Ohio St.2d 51, 55, (1975). On the other hand, when a petition alleges a due-process violation based on, for example, "the state's wrongful concealment of evidence beneficial to the defense, and that violation was not discovered until after trial, res judicata is no bar to the claim." *Id.* at ¶ 93.

{¶ 21} Special rules govern the application of res judicata to postconviction claims of ineffective assistance of counsel. Res judicata "does not bar a postconviction ineffective-assistance-of-counsel claim when either (1) the petitioner had the same attorney at trial and on appeal *or* (2) he must rely on evidence outside the trial record to establish his claim for relief. * * * The converse is that when the petitioner had a new

attorney on appeal and the claim could have been litigated based on the trial record, res judicata applies and the postconviction claim is barred. (Emphasis added.) *Blanton* at ¶ 2, citing *State v. Cole*, 2 Ohio St.3d 112, 113-114 (1982) (Post-conviction relief petitions raising claims of ineffective assistance of counsel pose "unique challenges."). The rationale for limiting the application of res judicata is that "when a defendant must rely on his attorney to develop the record or use evidence, and the attorney fails to do so, there is no other way for the defendant to establish the attorney's deficient performance except by presenting evidence outside the record." *Id.* A postconviction claim of ineffective assistance of counsel that relies upon competent evidence outside the record is "generally * * * sufficient, if not to mandate a hearing, [then] at least to avoid dismissal on the basis of res judicata." *Blanton* at ¶ 29, 31, quoting *Cole* at 114.

{¶ 22} In this case, we note that Clinton obtained new counsel to represent him on appeal. We discuss res judicata in greater detail below, and in the context of Clinton's various due process and ineffective assistance of counsel claims.

**B. Findings of fact, conclusions of law, and the need for specificity in death penalty cases**.

{¶ 23} If the trial court dismisses a petition, it "shall make and file findings of fact and conclusions of law with respect to such dismissal." R.C. 2953.21(D). The statute was amended in 2017 with respect to petitions "filed by a person who has been sentenced to death," such that "the findings of fact and conclusions of law shall state specifically the reasons for the dismissal of the petition and of each claim it contains." (Emphasis

12.

added.)  *Id.; see also* R.C. 2953.21(H) ("If the court does not find grounds for granting relief, it shall make and file findings of fact and conclusions of law and shall enter judgment denying relief on the petition.  If the petition was filed by a person who has been sentenced to death, the findings of fact and conclusions of law shall state specifically the reasons for the denial of relief on the petition and of each claim it contains.").

{¶ 24} "The obvious reasons for requiring findings are * * * to apprise petitioner of the grounds for the judgment of the trial court and to enable the appellate courts to properly determine appeals in such a cause."  (Internal quotation eliminated.) *State v. Mapson*, 1 Ohio St.3d 217, 219 (1982), *overruled on other grounds in State ex rel. Penland v. Dinkelacker*, 2020-Ohio-3774.  "A trial court need not discuss every issue raised by appellant or engage in an elaborate and lengthy discussion in its findings of fact and conclusions of law. The findings need only be sufficiently comprehensive and pertinent to the issue to form a basis upon which the evidence supports the conclusion." *Calhoun* at 291–292; *see also, State v. Ketterer,* 2017-Ohio-4117, ¶ 34 (12th Dist.) (Findings of fact and conclusions of law should be "clear, specific and complete.").

### C. Standard of Review

{¶ 25} "We review a decision to grant or deny a petition for postconviction relief, including the decision whether to afford the petitioner a hearing, under an abuse-of-discretion standard." *State v. Hatton*, 2022-Ohio-3991, ¶ 38, citing *State v. Gondor*, 2006-Ohio-6679, ¶ 51-52, 58. "The term 'abuse of discretion' connotes more than an

13.

error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St. 3d 217, 219 (1983). "Applying the wrong legal standard in a postconviction proceeding is also reversible error under an abuse-of-discretion standard." *Bunch,* 2022-Ohio-4723 at ¶ 25, citing *Hatton* at ¶ 29. When the trial court summarily denies a petition on purely legal grounds, such as res judicata, our review is de novo. *State v. Boaston*, 2021-Ohio-360, ¶ 44 (6th Dist.).

## IV.  CLINTON'S GROUNDS FOR RELIEF

**{¶ 26}** Clinton raised 66 grounds for relief in his petition.[1]  The trial court dismissed the petition, *in toto,* finding that his claims were either barred by res judicata or that they failed to allege substantive grounds for relief.  Clinton appeals the dismissal of all 66 grounds.

**{¶ 27}** Clinton's primary challenge in many of his assignments of error is the complete absence, or adequacy of the trial court's findings of fact and conclusions of law. In many instances, we agree with Clinton, and—as to those claims—we remand with the instruction that the trial court rule with the specificity required by R.C. 2953.21(D).  In some instances, we find that the trial court applied the wrong legal standard *and* that Clinton is entitled to a "prompt hearing on the issues." R.C. 2153.21.  We find that the trial court's dismissal of some grounds for relief was proper.

---

[1] In all, Clinton presented 67 grounds for relief, but he withdrew G/R. No. 42.

{¶ 28} The chart, set forth below, describes each ground for relief ("G/R No.") and indicates how the trial court ruled *or* if it failed to rule (designated as "N/A"), and the assignment of error ("A/E No.") containing each ground for relief, and our findings and disposition.

| Ground for Relief | Trial Court's Findings | A/E No. | Our Findings | Disposition |
|---|---|---|---|---|
| 1. *Brady* Claim | Denied | 2 | Inadequate Findings of Fact and Conclusions of Law ("F&C") | Remand |
| 2. *Brady* Claim | Denied | 2 | Inadequate F&C | Remand |
| 3. *Brady* Claim | Denied | 2 | Inadequate F&C | Remand |
| 4. Ineffective Assistance of Trial Counsel ("IATC") - trial phase | N/A | 4 | Failure to rule | Remand |
| 5. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 6. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 7. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 8. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 9. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 10. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 11. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 12. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 13. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 14. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 15. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 16. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 17. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 18. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 19. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 20. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 21. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 22. IATC-trial phase | Denied | 4 | Incorrect standard | Remand |

15.

| Ground for Relief | Trial Court's Findings | A/E No. | Our Findings | Disposition |
|---|---|---|---|---|
| 23. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 24. IATC-trial phase | Denied | 4 | Incorrect standard | Remand |
| 25. IATC-trial phase | Denied | 4 | Incorrect standard | Remand |
| 26. Due Process: DNA | N/A | 8 | Failure to rule | Remand |
| IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 27. IATC-trial phase | Denied | 4 | Incorrect standard | Remand |
| 28.Due Process: Involuntary Statement | Res judicata | 10 | | Affirm |
| 29. IATC-trial phase | Res judicata | 4 | Incorrect standard | Remand |
| 30. IATC: Cumulative Error | Denied | 4 | | Remand |
| 31. Actual innocence | Denied | 3 | | Affirm |
| 32. Due Process: Waiver | Res Judicata | 12 | | Affirm |
| 33. IATC-mitigation | Denied | 5 | | Remand |
| 34. Due Process: Waiver | Res Judicata | 12 | | Affirm |
| 35. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 36. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 37. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 38. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 39. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 40. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 41. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 42. (*Withdrawn*) | | | | N/A |
| 43. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 44. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 45. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 46. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 47. IATC: Cumulative Error | Denied | 5 | | Remand |
| 48. Fair Trial | Res Judicata | 6 | | Affirm |
| 49. IATC-trial phase | Res judicata | 4 | | Affirm |
| 50. R.C. 2953.21 | Denied | 15 | | Affirm |
| 51. Sentencing | Res judicata | 13 | | Affirm |
| 52. IATC-mitigation | Res judicata | 5 | | Affirm |

16.

| Ground for Relief | Trial Court's Findings | A/E No. | Our Findings | Disposition |
|---|---|---|---|---|
| 53. D.P.: Cumulative Error | Denied | 14 | | Remand |
| 54. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 55. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 56. IATC-mitigation | Denied | 5 | Inadequate F&C | Remand |
| 57. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 58. *Brady* Claim | Denied | 2 | Inadequate F&C | Remand |
| 59. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 60. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 61. IATC-both phases | Denied | 5 | Inadequate F&C | Remand |
| 62. Due Process: Chain of Custody | N/A | 9 | Failure to rule | Remand |
| IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 63. Fair Trial | Res Judicata | 6 | | Affirm |
| 64. Fair Trial | Res Judicata | 6 | | Affirm |
| 65. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| Fair Trial | Res Judicata | 7 | | Affirm |
| 66. IATC-trial phase | N/A | 4 | Failure to rule | Remand |
| 67. Due Process: Cumulative Error | Denied | 11 | | Remand |

## V. *BRADY v. MARYLAND* CLAIMS—G/R 1-3; 58

{¶ 29} In his second assignment of error, Clinton challenges the trials court's denial of four postconviction claims—G/R Nos. 1, 2, 3, and 58—which alleged that the state violated *Brady v. Maryland,* 373 U.S. 83 (1963).

{¶ 30} Generally, *Brady* imposes on the government "an obligation to turn over evidence that is both favorable to the defendant and material to guilt or punishment." *State v. Osie*, 2014-Ohio-2966, ¶ 153. There are three components of a "true *Brady* violation": (1) the evidence "must have been suppressed by the State, either willfully or

17.

inadvertently;" (2) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" and (3) "prejudice must have ensued"—i.e., the evidence was material. *State v. Thompson,* 2022-Ohio-2438, ¶ 169 (6th Dist.), quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

{¶ 31} In his petition, Clinton alleged that the state violated *Brady v. Maryland* by suppressing evidence pertaining to two distinct alternative suspect theories. That is, Clinton alleged that Heather Jackson's murder was drug-related, in response to her having become a "snitch" *or* that it was perpetrated by a former boyfriend who was overheard threatening to kill Jackson. Clinton claims that the state suppressed the following four pieces of evidence—which he obtained in postconviction—that supported those theories:

**Sandusky Police Incident Report 20-12010834.** This report documents a traffic stop and vehicle search by police of Heather Jackson's vehicle on August 30, 2012, one week before her death. According to the report, suspected drugs were found during the search. And later, at the police station, Jackson "advised [that] she wanted to work with detectives in lieu of charges being filed" and that she would contact police "at a later date." (G/R No. 1)

**Police Cruiser Videos.** Police cruiser videos that recorded conversations by Sandusky police officers "in front of the Jackson home,

immediately after the discovery of the bodies" were also suppressed. According to Clinton, the videos reveal conversations by police officers indicating that Jackson "had agreed to snitch on several local drug dealers, and that Jackson's own brother, Nick Fee, had told these drug dealers that Jackson was going to snitch on them." Clinton argues that the withheld evidence confirmed "Jackson's 'snitching' arrangement" with police, and without it, he was deprived of an opportunity to show "a possible motive for the Jackson family killings." (G/R No. 58).

**Travis Nickle phone records.** Clinton alleges that "Travis Nickle, in particular—had the motivation to commit the Jackson murders." Clinton argues that Nickle's phone records showed unusual and "pervasive telephone contact" between Nickle and Jackson throughout the night and early morning of Jackson's murder, including calls initiated by Nickle "after Clinton is known to have departed Jackson's home." (G/R No. 3).

**Erie County Sheriff's Office Incident Report**. Separately, Clinton argues that Jeremy Griggs "may have * * * murdered [Jackson and her children] because [Jackson] was threatening [to expose Griggs as] the alleged father of her children." According to the police report, two days after the murders, a cable television installer came forward to report that, while working in Grigg's home in August of 2012, he witnessed Griggs

threaten to kill Jackson and then brandish a handgun in reaction to Jackson's claim that she intended to seek paternity testing and child support from him. (G/R No. 2)

{¶ 32} In its decision, the trial court stated, correctly, that "Grounds for Relief 1-3 and 58 raise [*Brady*] claims." In support of its decision to deny those claims, the trial court then reviewed other evidence that "inculpated" Clinton as the sole perpetrator, notably DNA evidence and Clinton's statements to police and to his mother. Conversely, the court also concluded that "[n]one of the information in the *police reports* exculpates Clinton as the rapist and murderer of Heather and her children. None of the information in the *police reports* inculpates any perpetrator other than Clinton himself." (Emphasis added.) J.E. at 13. And, it concluded as a matter of law that "none of the information in the *police reports*" was exculpatory or impeaching, and therefore, the evidence did not constitute "*Brady* evidence." (Emphasis added.) J.E. at 14.

{¶ 33} Upon review, the trial court made no specific reference to *any* of the pieces of evidence identified in G/R Nos. 1, 2, 3 and 58. In particular, the judgment entry makes no mention of "dash cam videos" or Travis Nickle's cellphone records, which are the subjects of G/R Nos. 58 and 3, respectively. And, although the trial court did make findings and conclusions with respect to "police reports," it is clear that the court was not referring to the police reports identified in G/R Nos. 1 and 2, inasmuch as the court described them as "police reports about the Hanson brothers, Travis Nickle, and their circle of friends that included Heather." J.E. at 13. That does not describe, and cannot be

20.

said to relate to Sandusky Police Incident Report 20-12010834, which documents Heather Jackson's traffic stop and which is the basis of G/R No. 1. According to that report, Jackson was alone at the time she was pulled over, and neither the "Hanson brothers" nor "Travis Nickle" were mentioned therein. Likewise, the trial court made no findings or conclusions, relative to *Brady,* regarding Clinton's other, alternative theory, i.e. that Jeremy Griggs murdered Heather Jackson. The judgment entry makes no reference to Jeremy Griggs or the Erie County Sheriff's Report, relative to *Brady* or to G/R No. 2.

{¶ 34} Whether evidence is "favorable" under *Brady* requires a court to evaluate the undisclosed evidence "item by item" to determine whether it is either exculpatory or impeaching. "As the U.S. Supreme Court [has] recognized, 'there is no other way.'" Thompson, 2022-Ohio-2438, ¶ 176 (6th Dist.) quoting *Kyles v. Whitley,* 514 U.S. 419, 437 (1995) ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way."). The problem in this case is that—while the trial court concluded that the undisclosed evidence was neither exculpatory nor impeaching and therefore not "favorable evidence" under *Brady*—it failed to address the particular evidence identified by Clinton in any of his claims. We find, therefore, that the trial court failed to evaluate the evidence "item by item."

{¶ 35} "In order for an appellate court to determine the basis for judgment, the findings of fact and conclusions of law should respond to all material or determinative issues in the case." *State v. Ketterer*, 2017-Ohio-4117, ¶ 34 (12th Dist.) Here, we find

21.

that the trial court's findings and conclusions are inadequate as to G/R Nos. 1, 2, 3, and 58 because they fail to address the material and determinative issues presented by Clinton in those claims. Therefore, on this limited basis, we sustain Clinton's second assignment of error and remand for findings and conclusions as to those grounds for relief.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

{¶ 36} The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to * * * have the Assistance of Counsel for his defence." This right includes "the right to effective counsel – which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed." *United States v. Gonzalez-Lopez,* 548 U.S. 140, 148 (2006). Ohio's constitution grants a corresponding right, and Ohio evaluates ineffective assistance claims under the same standards that federal courts use. *See, e.g., State v. Worley,* 2021-Ohio-2207, ¶ 95.

{¶ 37} "To establish that trial counsel was ineffective, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *State v. Bunch*, 2022-Ohio-4723, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Regarding the prejudice prong, the defendant must prove that there is a 'reasonable probability' that counsel's deficiency affected the outcome of the defendant's proceedings." *Id.*, quoting *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

22.

**{¶ 38}** However, to be entitled to a hearing, a petition for postconviction relief "need not definitively establish counsel's deficiency or whether [the petitioner] was prejudiced by it." *Id.* at ¶ 27. Instead, the petition need only be "sufficient on its face to raise an issue" as to whether the petitioner was deprived of effective assistance and the claim "depends on factual allegations that cannot be determined by examining the record from [the petitioner's] trial." *Id.* A trial court errs in "in holding the defendant to 'the standard of proving that the outcome of the proceedings would have been different but for counsel's deficient performance.'" (Emphasis in original) *State v. Wright,* 2023-Ohio-2895, ¶ 35 quoting *Bunch* at ¶ 28 ("[E]mphasizing" that the court's "focus[] [was] on the standard for holding a hearing on a postconviction petition, not the standard for ultimately granting relief on the petition.").

**{¶ 39}** In this case, Clinton alleges that he was deprived of effective assistance of counsel during the trial and mitigation phases of his case, which he raises in assignments of error four and five, respectively. We address the former claims first.

### A. Trial-Phase Claims of Ineffective Assistance of Counsel

**{¶ 40}** Clinton raised 36 claims of ineffective assistance of counsel during the trial phase. As to a majority of them, the trial court failed to make *any* findings of fact or conclusions of law, requiring their remand.

**{¶ 41}** As to the remaining claims, the trial court determined that they were either barred by res judicata or that they failed on the merits, i.e. that Clinton failed to show that

23.

he was prejudiced by counsel's alleged defective performance. Because we find that the trial court applied the wrong legal standards, we remand—with one exception—those claims also.

### 1. Failure to rule—G/R Nos. 4-21, 23, 26, 54, 57, 59, 60, 62, 65, and 66

{¶ 42} The judgment entry incorrectly characterizes many ineffective assistance of counsel claims as *Brady* claims. *See* J.E. at 11 ("FINDINGS OF FACT AND CONCLUSIONS OF LAW *REGARDING BRADY CLAIMS* (CLAIMS 1 THROUGH 21, CLAIM 23, CLAIM 54, CLAIM 57, CLAIM 58, CLAIM 59, CLAIM 60).") (Emphasis added.) As just discussed—in response to Clinton's second assignment of error—*only* G/R Nos. 1-3 and 58 were *Brady* claims. Moreover, the discussion that follows that heading relates entirely to the issue of whether Clinton established any viable claims under *Brady.* It makes no findings or conclusions, nor can the judgment be construed as having made findings or conclusions, relative to the ineffective assistance claims raised in G/R Nos. 4-21, 23, 54, 57, 59, or 60. Moreover, no further mention is made of those claims anywhere in the judgment, explicitly or implicitly. Therefore, we remand the trial court's judgment, as to those grounds for relief, for findings and conclusions.

{¶ 43} Likewise, although the trial court made mention, it ultimately failed to make any ruling as to G/R Nos. 26, 62, 65, and 66. Thus, in G/R No. 26, Clinton argued that trial counsel was ineffective for not objecting to the state's failure to comply with the "DNA Court Order." In its judgment entry, the trial court made no findings or conclusions with regard to that claim, notwithstanding its caption that Clinton "fail[ed to

24.

show deficient performance of trial counsel [and prejudice] as to claim * * * 26." J.E. at 16-17. Given the lack of any reference in the judgment to the DNA court order or the consumption of DNA, we find that the trial court did *not* make any findings with regard to G/R No. 26.

{¶ 44} In G/R No. 62, Clinton argued that his counsel was ineffective for failing to ensure that the chain-of-custody of all admitted crime scene evidence was not broken, undocumented or unproven. Upon review, the trial court clearly *described* Clinton's legal arguments. *See* J.E. at 17. However, its findings and conclusions are limited to "crime scene" evidence only. That is, there is no mention of "swabbings," nor are there findings or conclusions relative to Clinton's due process or ineffective assistance arguments relative to swabbings. We remand the judgment with respect G/R No. 62 for findings and conclusions.

{¶ 45} In G/R No. 65, Clinton alleges that the absence of nearly any voir dire on the subject of race violated his constitutional right to a fair trial *and* to effective counsel. Upon review, the trial court issued findings and conclusions with regard to the due process claim only. *See* J.E. at 10. Accordingly, we remand with respect to Clinton's ineffective assistance of counsel claim.

{¶ 46} In G/R No. 66, Clinton argued that his counsel was ineffective for failing to investigate and cross-examine the police regarding the clothing that Clinton was wearing when he was apprehended. The trial court misidentified G/R No. 66 as a claim "relative to the defense not calling to the witness stand its own crime scene evidence." But, it

25.

made no findings or conclusions as to the merits of the actual claim. We remand the trial court's judgment as to G/R No. 66 for findings of fact and conclusions of law.

### 2. Incorrect Standard Applied by the Trial Court

{¶ 47} Here, we address claims asserted by Clinton that counsel was ineffective for failing to retain expert witnesses during his trial. "When the core of the state's case against a defendant involves evidence that the jury cannot properly understand without the assistance of expert testimony, the failure to engage a competent expert can constitute deficient performance." *Bunch*, 2022-Ohio-4723, at ¶ 40 citing *Hinton v. Alabama*, 571 U.S. 263, 273 (2014). "And when the core of a defendant's claim or defense turns on evidence that cannot be properly provided to a jury without the use of expert testimony, the failure to engage experts can also constitute deficient performance." *Id*., citing *State v. Herring*, 2014-Ohio-5228, ¶ 73-79, 80.

{¶ 48} As to each of these claims, the trial court found that Clinton failed to show deficient performance or prejudice for counsel's failure to secure expert witnesses at trial. As set forth below, we find that the trial court erroneously held Clinton "to the standard of *proving* that the outcome of the proceedings would have been different but for counsel's deficient performance." (Internal quotation omitted.) *Bunch.* at ¶ 35. Because Clinton did not have to definitively prove deficiency or prejudice, we reverse the trial court's decision as to those claims, and we further find that Clinton established a right to a hearing. *Id.* at ¶ 29.

26.

### a. Failure to retain a qualified forensic pathologist: <u>G/R Nos. 22 and 24</u>

{¶ 49} In his petition, Clinton argued that counsel was ineffective for failing to retain a qualified forensic pathologist who would have assisted the defense in (1) challenging the state's use of "other acts" evidence under Evid.R. 404(B) and (2) in cross-examining a police detective who presented that evidence. *See* G/R Nos. 22 and 24.

{¶ 50} The evidence at issue involved the 1997 death of Misty Keckler. Clinton pled guilty, was convicted of involuntary manslaughter and served time in prison for Keckler's death. Prior to trial—in this case—the state gave notice that it intended to present evidence relating to the Keckler's death, for the purpose of proving the identity of the killer of the Jackson family and to prove the identity and modus operandi of Clinton when committing a sexual assault of E.S. Other-acts evidence is admissible to prove identity through a certain modus operandi only if it is "related to and share[s] common features with the crime in question." *State v. Lowe,* 69 Ohio St.3d 527, 531 (1994). Trial counsel objected to the use of Evid. R. 404(B) evidence. But, the trial court found that the probative value of the Keckler evidence was not substantially outweighed by the danger of unfair prejudice and allowed the evidence to be admitted.

{¶ 51} At trial, the state called Fostoria Police Detective Michael Clark (Ret.), who investigated Keckler's homicide, to testify. Det. Clark testified that Keckler's body had ligature marks on her neck, that her hands were bound behind her back, and that her ankles were bound together. He further testified that it was clear that Keckler's killer had

bound her hands and ankles after she died, based upon the absence of bruising to those areas. Finally, Det. Clark testified that Clinton had admitted to having sexual contact with Keckler. *See Clinton,* 2017-Ohio-9423, at ¶ 102. After Det. Clark testified, trial counsel moved for a mistrial, which was denied.

{¶ 52} Attached to Clinton's petition for postconviction relief was an affidavit from Carl J. Schmidt, M.D., a "subspecialist in forensic pathology." Dr. Schmidt reviewed Keckler's autopsy, and he concluded that, based upon the location of the ligature marks on Keckler's neck and shoulders, the manner of death was "inconsistent with strangulation." In his opinion, Keckler—whose "nude body was found face down in the bathtub"—died by drowning. *Clinton* at ¶ 101. Based upon that finding, Dr. Schmidt opined that "the injuries found on Misty Keckler are different in kind from the injuries seen on [the Jackson family]."

{¶ 53} In G/R No. 22, Clinton argued that, if trial counsel had retained a qualified expert, the defense could have more effectively challenged the state's theory that Keckler's death was part of a modus operandi and therefore "rebutted the appropriateness of the [state's] use of the evidence as other acts evidence." In G/R No. 24, Clinton complained that trial counsel asked "only" one question while cross-examining Detective Clark. He claimed that, if the defense had the assistance of an expert like Dr. Schmidt, they could have undermined Clark's "unqualified opinion[]" testimony that the manner of Keckler's death was part of a "modus operandi."

28.

{¶ 54} First, we note that Clinton's claims regarding trial counsel's failure to retain and to present the testimony of an expert witness was based on evidence—Dr. Schmidt's affidavit—that was not included in the trial record. Thus, his claim could not have been meaningfully reviewed on direct appeal and is not barred by res judicata. *Blanton,* 2922-Ohio-3985, at ¶ 67.

{¶ 55} Indeed, the trial court reviewed the merits of Clinton's claims, finding that Clinton failed to establish a claim of ineffective assistance of counsel, under either prong of the *Strickland* test, i.e. that his counsel's performance was deficient, and (2) that such deficient performance prejudiced the defense. *Id.* at 687. Specifically, the trial court ruled that trial counsel "had no professional obligation to revisit the cause of death of Misty Keckler by way of a defense expert forensic pathologist * * * where the state did not offer an expert forensic pathologist relative to the cause of death of Misty Keckler." J.E. at 15. The trial court also held Clinton to the standard of proving that the outcome of the proceedings would have been different but for trial counsel's performance, when it concluded that "Clinton fails to show prejudice as to claim 22 and claim 24 [in that] the DNA evidence * * * conclusively shows that Clinton raped and murdered the minor female child, [which] eliminates any outcome determinative significance to the medical details of the asphyxiation death of Misty Keckler." J.E. at 15.

{¶ 56} To warrant a hearing, Clinton did not "not [have to] definitively establish counsel's deficiency or whether [he] was prejudiced by it." *Id.* at ¶ 27. In *Bunch,* the petitioner alleged that his trial counsel was ineffective for failing to procure an

29.

eyewitness-identification expert to analyze the case and testify at trial. Attached to the petition was an affidavit from an expert witness who opined that the eye-witness testimony presented at trial was likely "inaccurate." The trial court rejected the claim, without holding a hearing, finding that trial counsel's failure to use an expert and instead to rely on cross examination did not constitute ineffective assistance of counsel as a matter of law *and* that an expert would not have altered the trial's outcome. The court of appeals affirmed. *Id.* at ¶ 17. In remanding for a hearing, the Ohio Supreme Court found that Bunch's petition stated a substantive ground for relief because he "provided evidence that, if true, set out a prima facie case that he was deprived of his constitutional right to the effective assistance of counsel." *Id.* at ¶ 45; *Accord, State v. Carswell*, 2023-Ohio-4574, ¶ 46 (6th Dist.) (Remanding for a hearing where the trial court rejected the arguments raised in petition as "second guessing the strategic decisions of trial counsel" and "armchair quarterbacking" and also "incorrectly failed to distinguish between standards that are appropriate in direct appeals and those that are to be applied when determining whether a postconviction hearing should be held.").

{¶ 57} Similarly here, we find that trial court held Clinton to an erroneously high standard and that an evidentiary hearing is necessary as to the claims set forth in G/R Nos. 22 and 24.

### b. Failure to retain a DNA statistician: G/R No. 25

{¶ 58} In his petition, Clinton argued that because the case "rose and fell" on DNA evidence, his trial counsel was ineffective for failing to "confront" that evidence

30.

with a DNA statistician, who would have assisted the defense in cross-examining the state's expert *and* presenting expert testimony under direct examination. *See* G/R No. 25. In support, Clinton attached an affidavit from Dan Krane, Ph.D. a self-described "expert witness" who uses "computer-based tools to evaluate DNA evidence associated with criminal investigations." Among his assertions, Dr. Krane averred that "Allelic/locus drop out must be invoked in order to include Curtis Clinton as a potential contributor to the DNA testing results obtained from the anal swab of [C.J.];" that "[t]here is no generally-accepted method of attaching a statistical weight to a mixed sample where allelic/locus dropout may have taken place;" and "[u]ntil a generally-accepted method of identifying the probability of allelic dropout is established, the statistical weight associated with partial mixtures can best be described as being 'inconclusive.'" Clinton argues that the failure to "obtain[] the services' of a qualified DNA statistician cannot be considered a "strategic" decision in the absence of a "full investigation," which was not conducted in this case. And, Clinton claims, the absence of an expert "clearly prejudiced" him, as evidenced by at least one juror's sworn affidavit, also attached to the petition, in which the juror averred that "[i]f there was any doubt presented as to the DNA, I never would have signed a death warrant."

{¶ 59} In its decision, the trial court found that Clinton "fail[ed] to show deficient performance, * * * especially where Clinton *had* his own DNA expert at trial and offers no evidence why the [expert] was not called to testify." (Emphasis added.) J.E. at 17. The court further found that Clinton failed to show that he was prejudiced by the absence

31.

of defense-expert DNA testimony because the evidence—that *was* presented—conclusively showed that Clinton "raped and murdered the minor female child [which] eliminates any outcome-determinative significance to scientific nuances in the collection and analysis of DNA evidence [as] shown in * * * Dr. Krane's [affidavit]." *Id.*

{¶ 60} Again, the court erred in failing to apply the proper standard for "simply obtaining a hearing on a petition for post-conviction relief." *State v. Wright,* 2023-Ohio-2895, ¶ 2 (2d Dist.). Clinton did not have to definitively prove deficiency or prejudice to obtain a hearing. *Id.* at ¶ 78. Rather, the petition need only be sufficient on its face to raise issues about whether the petitioner was deprived of effective assistance of counsel. We find that Clinton's petition, as set forth in G/R No. 25, stated a substantive ground for relief. Clinton presented evidence that, if true, set out a prima facie case that he was deprived of his constitutional right to the effective assistance of counsel. *Accord Carswell,* 2023-Ohio-4574, at ¶ 56 (6th Dist.). For this reason, the trial court erred in rejecting Clinton's G/R Nos. 25 without a hearing.

### c. Failure to utilize a crime scene expert: <u>G/R No. 27</u>

{¶ 61} Clinton alleges that his counsel was also ineffective for failing to "use a crime scene expert to challenge the State's case." *See* G/R No. 27. Prior to trial, defense counsel "retained" crime scene expert and reconstructionist, Gary Rini, M.F.S., but did not present his testimony at trial. Clinton complains that Dr. Rini should have been called to challenge the state's evidence and for use in cross-examining state witnesses. In his affidavit, submitted with Clinton's petition, Dr. Rini offers his expert opinion

32.

regarding the mishandling of evidence in this case, violations of police protocols which "compromised the integrity of the crime scene," and the improper cataloguing of evidence and unsigned police reports. Clinton argues that trial counsel's decision to forgo presenting Dr. Rini's testimony cannot be considered strategic.

{¶ 62} The trial court denied the claim, concluding that it was barred by res judicata and "[t]o the extent that [is not]," Clinton failed to show deficient performance or prejudice. That is, it found that because the evidence that "inculpated Clinton" was recovered during the autopsies and not from the crime scene, trial counsel "could properly conclude that [Clinton's case] would not materially benefit from testimony by a 'crime scene expert.'" As for prejudice, the court found that Clinton's "admission to being physically present with Heather and her children during the time period within which the crimes could have taken place, in context of the DNA evidence that conclusively shows, * * * that Clinton raped and murdered the minor female child, eliminates any outcome-determinative significance to crime scene matters shown in post-conviction expert Gary Rini's [report]." J.E. at 19.

{¶ 63} First, we note that, contrary to the trial court's findings, Dr. Rini did offer expert testimony relative to the *collection* of DNA evidence, i.e. evidence that—in the trial court's words—"conclusively linked Clinton to the rapes and murders. Dr. Rini's affidavit notes an "altered" consent-to-search form, regarding the "collection of DNA swabs from the penis of Curtis Clinton." Specifically, Dr. Rini observed that the number of swabs "collected initially" was documented as "2" but that number was crossed out

and replaced with the number "1." The change was made "without attribution as to the source of this alteration," in violation of "FBI guidelines." Dr. Rini opined that, in the absence of an "accounting or attribution as to the source of this alteration * * * [there was] no reliable accounting as to the actual number of swabs collected, nor to the chain of custody of the DNA swabs collected [in this case]." We find that the trial court erred in presuming that trial counsel's decision not to present Dr. Rini's testimony was strategic and further erred in requiring that Clinton definitively prove that the outcome of this case would have been different. *Bunch* at ¶ 36 ("In the present context of postconviction litigation, it is possible and appropriate to question whether a trial counsel's decisions [not to call an expert] were in fact deliberate and strategic and whether strategic decisions were reasonable ones.").

{¶ 64} In sum, we find that the trial court applied the wrong legal standard in G/R Nos. 22, 24, 25 and 27, which is reversible error under an abuse of discretion standard. *Bunch* at ¶ 25, citing *State v. Hatton* 2022-Ohio-3991, ¶ 29. We further find that each of those claims is sufficient on its face to raise an issue regarding whether Clinton was deprived of the effective assistance of counsel, and that each claim depends on factual allegations that cannot determined by examining the trial record. Accordingly, we conclude that a hearing is necessary as to G/R Nos. 22, 24, 25 and 27.

34.

### 3. Res Judicata

{¶ 65} The trial court dismissed two trial-phase claims of ineffective assistance of counsel on the basis that they were barred on res judicata grounds. *See* G/R Nos. 29 and 49. [2]

{¶ 66} As the first step of our *Blanton* analysis, we consider whether Clinton introduced competent evidence of ineffective assistance that is dehors the trial court record. *Blanton* at ¶ 33. "Competent evidence" is evidence that is both admissible and that tends to establish a fact at issue. *State v. Allison,* 2024-Ohio-872, ¶ 20 (6th Dist.), citing *Hall v. Hall,* 2018-Ohio-4453, ¶ 8 (6th Dist.). If so, the court must determine if that evidence presents substantive grounds for relief; "that is, if believed, would the newly presented evidence—together with any evidence in the trial record—establish that counsel was ineffective?" *Blanton* at ¶ 33-34. A postconviction claim of ineffective assistance of counsel that relies upon competent evidence outside the record is "generally * * * sufficient, if not to mandate a hearing, [then] at least to avoid dismissal on the basis of res judicata." *Blanton* at ¶ 29, 31, quoting *Cole* at 114.

### a. Failure to Object to the Admission of Clinton's Police Interview: <u>G/R No. 29</u>

{¶ 67} In his petition, Clinton argued that trial counsel was ineffective for failing to object to the admission of his "involuntary" statement to police. *See* G/R No. 29.

---

[2] As indicated in the previous section, the trial court dismissed G/R 27 on the basis of res judicata and "even if not" then on the merits. We have remanded G/R No. 27 for a hearing.

35.

**{¶ 68}** By way of background, Clinton was admitted "as a suicidal person" to Bellevue Hospital around 5 a.m. on Sunday, September 9, 2012, a little more than 24 hours after the murders of the Jackson family were alleged to have taken place. *Clinton* at ¶ 20. Clinton remained in the hospital until the next day, September 10, 2012. That morning, the police arrived at the hospital, and Clinton, "who was being discharged, agreed to go with them to the Sandusky police department." *Id.* During his videotaped interview, Clinton admitted to being in Jackson's home on the preceding "Friday night or early Saturday morning" and that the two "had sex." *Id.* He told police that "someone else must have gone to Jackson's home after he left." When informed that he was the last person to have had contact with Jackson, Clinton said, "I don't think so. I doubt it. I really doubt it." Clinton added, "If something happened, I don't remember it," and he later repeated, "I ain't done nothing." *Id.* at ¶ 25.

**{¶ 69}** In his direct appeal, Clinton challenged the admissibility of the video-taped interview on different grounds, specifically that it was accompanied by inaccurate captions, which the Ohio Supreme Court found lacked merit. *See Clinton* at ¶ 146-150.

**{¶ 70}** In his petition, Clinton included his own affidavit, in which he asserted that he tried to commit suicide by ingesting "over 100 tablets of Tylenol" and "so much alcohol that [his] blood alcohol level was over three times the legal limit." Hospitalization records, which Clinton also submitted, indicate that he was "disoriented" and in and out of consciousness throughout the day of his admission, i.e. September 9, 2012. As for his police interview the next day, Clinton asserts that he only recalls "about

36.

15 minutes" of it, despite the fact that it lasted for "several hours." He claims that he was "disoriented" and did not know what he was saying. Clinton also relied on the affidavit from Mercedes Charlton who was with Clinton in the hospital and averred that she "does not believe that [Clinton] could have had any idea what he was saying to police." Clinton argues that, under these conditions, his statements to police were involuntary, and trial counsel's failure to challenge the admission of his statement on that basis amounts to ineffective assistance.

{¶ 71} The trial court found that the claim was barred on res judicata grounds. It reasoned that, "[h]ad Clinton wished to challenge the admissibility of his admissions to the police due to mental impairment from street drugs or hospital medications he could have done so." J.E. at 7-8.

{¶ 72} First, we note that the trial court did not identify or refer to any of the evidence cited by Clinton, nor did it explain why the supporting documents do not prevent the application of res judicata, in contravention of *State v. Lester*. *See, e.g., State v. Ketterer*, 2017-Ohio-4117, ¶ 38 (12th Dist.) (Findings and conclusions inadequate where "the entries do not indicate [that] the trial court reviewed the documents submitted in support of the PCR petitions, do not contain any reference to those supporting documents, and do not explain why the supporting documents do not prevent the application of res judicata.").

{¶ 73} Further, because evidence of Clinton's drug and alcohol use, and the alleged effect they had on his police interview, are not part of the record, the issue raised

37.

by Clinton in his petition could *not* have been determined without evidence outside the record. Accordingly, Clinton's claim is not barred by res judicata. *Accord Blanton* ("res judicata does not bar a postconviction ineffective-assistance-of-counsel claim when * * * [the petitioner] must rely on evidence outside the trial record to establish his claim for relief."); *State v. Nobles,* 106 Ohio App.3d 246, 275 (2d Dist.1995) ("If it is the case that Xanax could have caused Nobles to make a false confession, though it was made some twelve hours after she ingested the drug, then counsel will have to raise the matter in a petition for postconviction relief.").

{¶ 74} Next, we consider whether the evidence outside the record, together with any evidence in the record, if believed, presents substantive grounds for relief. *Blanton* at ¶ 33-34. "[S]ubstantive grounds for relief" exist if Clinton's allegations are sufficient to state an ineffective-assistance claim (i.e., that trial counsel's representation was deficient and that he was prejudiced as a result), and the files and records of the case do not affirmatively disprove this claim. *Id.* at ¶ 24.

{¶ 75} Even when *Miranda* warnings are not required, a confession may be involuntary if, under the totality of the circumstances the "'defendant's will was overborne' by the circumstances surrounding the giving of a confession.'" *State v. Petitjean*, 140 Ohio App.3d 517, 526 (2d Dist.2000), quoting *Dickerson v. United States,* 530 U.S. 428, 434 (2000). *See also, State v. Stewart*, 75 Ohio App.3d 141, 147 (8th Dist.1991) ("The lingering effects of drugs or alcohol do not render a confession

38.

involuntary in the absence of evidence that the substance has impaired the defendant's ability to reason.").

{¶ 76} Here, Clinton averred that he ingested so much Tylenol and alcohol that, more than 48-hours later, he felt "disorientated" from those substances, to the point that he did not know what he was saying during his police interview. Of course, the mere fact Clinton *may* have been impaired after his release from the hospital does not make his confession involuntary as a matter of law. *Nobles* at 275. However, it may be the case that "significant narcotic impairment would have made [his] confession inadmissible because [it was] unreliable." *Id.*

{¶ 77} While "a trial court *may* judge the credibility of a supporting affidavit and discard claims that are purely frivolous," the trial court in this case did not acknowledge the evidence submitted in support of Clinton's claim, much less address its credibility. *Calhoun,* 86 Ohio St.3d at 292. Curiously though, the court did find, without attribution, that "any effects from street drugs or alcohol that had been ingested by Clinton prior to his hospitalization would have dissipated to nothing by the time Clinton entered police custody." J.E. at 7.

{¶ 78} While we express no opinion as to the credibility of Clinton's evidence, we find that the record does not, on its face, disprove Clinton's claim—that his statement to police was involuntary and thus ineffective assistance *not* to challenge its admission. We find that Clinton's evidence was sufficient to avoid dismissal on the basis of res judicata *and* to warrant a hearing, and we remand G/R 29 for that purpose.

39.

**b. Failing to object to jurors and to renew motion for a change in venue: G/R No. 49**

{¶ 79} Clinton alleges that counsel was deficient for failing to object to jurors who were "exposed to prejudicial pretrial publicity." (G/R No. 49). In support, Clinton points to voir dire proceedings, indicating that seven jurors "candidly admitted" to receiving information from the media that Clinton was a suspect. Because this voir dire evidence was part of the trial record, the trial court "properly concluded that the claim could have been adjudicated on direct appeal." *Blanton* at ¶ 79. ("But again, this voir dire evidence was part of the trial record. The trial court and court of appeals properly concluded that [counsel's failure to move for a change of venue] could have been adjudicated on direct appeal.").

{¶ 80} Separately, Clinton alleges that counsel was ineffective for failing to renew a motion for a change of venue, after voir dire had been conducted. (G/R No. 49). For this, Clinton relied upon news articles, identified as Ex. 57, which he claims establish that a "maelstrom of publicity" existed in Erie County.

{¶ 81} The trial court found that, because the Ohio Supreme Court "addressed and rejected" Clinton's change-of-venue claim—on direct appeal—his ineffective assistance claim was barred by res judicata and "[f]urthermore" that the claim lacks merit. J.E. at 19. Because Clinton's ineffective assistance claim is based on evidence dehors the record, it is not—on its face—barred under res judicata. *Blanton* at ¶ 105.

{¶ 82} Still, we conclude that the trial court reached the correct judgment. *Id.* at ¶ 109. That is, because we find, elsewhere in this opinion, that Clinton failed to establish a

40.

substantive right to relief as to his change-of-venue claim, his ineffective assistance of counsel claim must similarly fail. *Blanton* at ¶ 110. The merits of Clinton's change-of-venue claim are addressed at ¶ 93 to 103. We affirm the trial court's judgment dismissing G/R No. 49.

### B. Mitigation-Phase Claims of Ineffective Assistance of Counsel— <u>G/R Nos. 33, 35-41, 43-46, 52, 55, 56, and 61.</u>

{¶ 83} In his fifth assignment of error, Clinton challenges the trial court's dismissal of mitigation-phase claims of ineffective assistance of counsel.

{¶ 84} In his petition, Clinton alleged that trial counsel was ineffective for: failing to ensure that his waiver—of his right to offer evidence in mitigation—was knowing and voluntary (G/R No. 33); failing to ensure that Clinton was present at all critical proceedings (G/R No. 35); failing to develop a "rapport" and to communicate with Clinton (G/R No. 36); failing to present the testimony of family and friends, including Clinton's mother, sister, step-brother, aunt, girlfriends, friends, and nephew (G/R Nos. 37-41, 55, 61); failing to investigate and present testimony from experts in the fields of psychology, prison, sexual abuse, neuroimaging, and neuropsychology (G/R Nos. 43-46, 56); and failing to argue that R.C. 2929.11 violates Clinton's constitutional rights; (G/R No. 52). The evidence offered by Clinton in support of these grounds for relief included affidavits from those people, whom Clinton argues should have been called to testify in mitigation.

{¶ 85} In its decision, the trial court "adopt[ed]" findings by the Ohio Supreme Court, from Clinton's direct appeal, that: (1) Clinton did *not* waive all mitigation; (2)

Clinton presented mitigating evidence by way of an unsworn statement; (3) Clinton instructed his counsel not to present any *other* mitigating evidence; and (4) Clinton was evaluated by a neuropsychologist to ensure his competency. J.E. at 20, citing *Clinton* at ¶ 195-196. But, the trial court made no specific mention of Clinton's postconviction claims, except to note "the absence of evidence in the post-conviction record that would contradict or alter this finding of fact," i.e. that Clinton instructed his counsel not to present any mitigating evidence on his behalf. *Id.* As a matter of law, the court concluded that trial counsel's decision not to present additional evidence in mitigation "was not deficient [because] trial counsel competently and properly followed Clinton's own personal decision to limit the mitigation presentation to Clinton's unsworn statement." J.E. at 21, citing *State v. Ward,* 2014-Ohio-426; *State v. Gonzales,* 2010-Ohio-4703 (6th Dist.); *Schriro v. Landrigan,* 550 U.S. 465, 477 (2007).

{¶ 86} In *State v. Lavender,* 2021-Ohio-4274, ¶ 10 (1st Dist.), the trial court "summarily concluded" that no ineffective assistance of counsel was demonstrated based upon its conclusion that the supporting affidavits were "entitled to little weight" and were "inconsequential" because, although they "provide additional background information or potential alternative strategies for trial, [they] do not rise to the level of showing [a] constitutional violation." *Id.* On appeal, the First Appellate District found that the trial court's findings of fact and conclusions of law were inadequate because they did not "describe or discuss the substantive issues presented by, or the evidence offered in support, of the claims." *Id.* at ¶ 10, citing *See State v. Issa*, 2000 WL 1434159 (1st. Dist.

42.

Sept. 29, 2000) (findings of fact and conclusions of law fail to address a determinative issue and provide a basis for a resolution of that issue"); *State v. Crossley*, 2020-Ohio-6640, ¶ 35 (2d Dist.) (findings of fact and conclusions of law fail to specifically address an ineffective-counsel claim or sufficiently explain discounting the credibility of supporting affidavits); *Ketterer* at ¶ 38 (findings of fact and conclusions of law "generically label[ed]," then summarily denied, multiple postconviction claims and did not indicate review of supporting evidence); *State v. Guenther*, 2007-Ohio-681, ¶ 8-9 (9th Dist.) (findings of fact and conclusions of law fail to specifically address postconviction claims).

{¶ 87} In this case, the trial court's findings and conclusions are inadequate in the same way, if not more so, than those in *Lavender*.  That is, the trial court did not describe or discuss *any* of the ineffective-assistance-of-counsel-in-mitigation-claims, other than to generically label them in a heading.  Additionally, there is no indication that the trial court reviewed the evidence outside the record relied upon by Clinton, inasmuch as the opinion contains no reference to the evidence and fails to explain why the evidence fails to establish substantive grounds for relief.  Finally, of the three cases cited as legal precedent by the trial court, only the *Landrigan* case would appear to support the purported basis upon which it denied Clinton's claims.  *See Landrigan* at 477 ("Because the Arizona postconviction court reasonably determined that Landrigan 'instructed his attorney not to bring any mitigation to the attention of the [sentencing] court,' * * * [t]he District Court was entitled to conclude that regardless of what information counsel might

43.

have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence. Accordingly, the District Court could conclude that because of his established recalcitrance, Landrigan could not demonstrate prejudice under *Strickland* even if granted an evidentiary hearing.").

{¶ 88} Even where it may be said that a trial court "probably reach[es] the correct result," its decision must be remanded for findings and conclusions where it fails to "state specifically the reasons for the dismissal * * * of *each claim*." (Emphasis added.) *State v. Porter,* 2021-Ohio-4630, ¶ 27 (7th Dist.) ("Despite probably reaching the correct result, the trial court's decision is reversed and the matter is remanded with instructions for the trial court to issue findings of fact and conclusions of law as is required in R.C. 2953.21(H)."). This is especially true in this case, in light of the amendment to R.C. 2953.21(D) requiring that, in death penalty cases, that findings and conclusions "shall state specifically the reasons for the dismissal of the petition and of each claim it contains." For these reason, we find Clinton's fifth assignment of error well-taken, in part, and we remand for findings and conclusions as to G/R Nos. 33, 35-41, 43-46, 55, 56, and 61.

{¶ 89} This leaves only G/R No. 52—Clinton's mitigation-phase claim of ineffective assistance for counsel's failure to argue that R.C. 2929.11 violated his constitutional rights. We find that this ground for relief was properly dismissed, in light of our conclusion elsewhere that the underlying claim is without merit. See ¶ 137-143.

44.

## VII. DUE PROCESS CLAIMS

**{¶ 90}** Next, we address those post-conviction claims asserting that Clinton's right to a fair trial and other due process rights were violated. The trial court denied most of the claims on res judicata grounds. Res judicata precludes those due process claims that could have been developed during the trial proceedings. *Blanton*, 2022-Ohio-3985, at ¶ 92, 93. In *Blanton,* the Ohio Supreme Court specifically declined to "expand [the] exception [to res judicata]" which would have allowed a due process claim in postconviction to proceed, even when the alleged violation was known to the defense at the time of trial, i.e. "to reach the merits of a claim that could have been—but was not— fully developed during the trial proceedings." *Id.* The court found that to do so would "upend decades of caselaw." *Id.*

**{¶ 91}** To warrant a hearing the petitioner bears the burden of producing evidence dehors the record that would render the judgment void or voidable and also show that he could not have appealed the claim based upon information contained in the original record. *State v. Spaulding,* 2018-Ohio-3663, ¶ 11 (9th Dist.). The evidence dehors the record must "demonstrate that the claims advanced in the petition could not have been fairly determined on direct appeal based on the original trial court record without resorting to evidence outside the record." *Id.* However, "[p]resenting evidence outside the record does not automatically defeat the doctrine of res judicata." (Quotation omitted.) *Id.* Rather, the evidence relied upon by a petitioner "'must meet some threshold standard of cogency; otherwise it would be too easy to defeat the holding of

45.

*[State v. Perry]* by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim[.]'" (Internal citations omitted.) *Id.* quoting *State v. Coleman*, 1993 WL 74756, *7 (Mar. 17, 1993 1st. Dist.).

{¶ 92} With the above principles in mind, we address Clinton's due process claims.

## A. Failure to grant a change of venue—G/R No. 48

{¶ 93} Clinton's sixth assignment of error includes the argument that the trial court abused its discretion when it failed to grant him a hearing on the issue of whether his right to a fair trial was violated when he was denied a change of venue. *See* G/R No. 48. Prior to trial, Clinton filed a motion for a change of venue, arguing that Erie County had "been saturated with extensive media coverage of the incident;" that "similar coverage [was] likely to resume once the trial [began];" and that "media accounts * * * ha[d] created a presumption of [Clinton's] guilt that [was] widespread in the community." *See* Defendant's Motion for a Change of Venue, 10/07/2013. Clinton's motion was denied, which he assigned as error in his direct appeal. *See Clinton* at ¶ 58-69. The Ohio Supreme Court rejected the claim, finding no evidence of "actual prejudice." It further found that the publicity in the case, though "extensive and adverse," was not so damaging that prejudice should be presumed. *Id.* at ¶ 63, 69, citing *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (Noting that "in certain rare cases, pretrial publicity is so damaging that courts must presume prejudice even without a showing of actual bias" but adding that the presumption "attends only the extreme case").

46.

{¶ 94} In post-conviction, Clinton repeated his claim, i.e. that an "overwhelming amount of pre-trial publicity and community activity" deprived him of a fair trial. *See* G/R No. 48. Clinton included with his petition "copious media articles" and an affidavit from his defense investigator, who interviewed a juror and set forth the contents of their conversation.

{¶ 95} The trial court found that Clinton's change-of-venue claim was barred by res judicata because "the matter of pre-trial publicity was expressly raised on direct appeal" and that "none of the evidence *dehors* the record * * * would have had any material effect on the propriety of the adjudication of the claim by the Ohio Supreme Court." J.E. at 9.

{¶ 96} Clinton insists that, in light of the evidence outside of the record, his postconviction claim is qualitatively different than the claim raised on direct appeal. We review the evidence below.

{¶ 97} First though, we note that Clinton relied extensively on evidence *within* the trial record. For example, Clinton asserts in his petition that "Juror 96 * * * followed the Clinton investigation through the on-line version of the [Sandusky] Register and its bloggers. Jurors 143 and 210 also admitted to following the events in the newspaper, with Juror 210 adding that he knew Clinton 'was a suspect in these murders.'" * * *. *See* Petition at ¶ 420, citing Ind. VD Vol. 1, pp 62-64, 76-78; Vol. 4, pp. 537-538. As noted by the court in Clinton's direct appeal, jurors need not be totally ignorant about the facts of a case. *Clinton,* 2017-Ohio-9423, at ¶ 67, citing *Irvin v. Dowd*, 366 U.S. 717, 722

47.

(1961). Further, because this evidence was available and known to Clinton and *was presented* in his direct appeal, it is barred by res judicata. *Blanton* at ¶ 93-94. Moreover, Clinton's reliance on evidence within the trial record undermines the argument that res judicata should not apply. *State v. Grate,* 2023-Ohio-2103, ¶ 71 (5th Dist.).

{¶ 98} Clinton did proffer evidence outside the record, including an affidavit from his defense investigator, Kelly Heiby, who interviewed Juror 210. *See* Ex. 51. Upon review, *none* of the juror's alleged remarks to the investigator relate to the issue of pretrial publicity. Therefore, it cannot be considered as evidence in support of Clinton's change-of-venue claim.

{¶ 99} Finally, Clinton included approximately 200 pages of documents, which appear to be copies of news articles, downloaded from the internet. *See* Ex. 57. The articles are from various news outlets including *The Sandusky Register, The Toledo Blade,* and the Fox News affiliate in Cleveland.

{¶ 100} As a preliminary point, we note that the purported news articles were not authenticated. R.C. 2953.21(A)(1)(b) states that "[a] petitioner * * * may file a supporting affidavit and *other documentary evidence* in support of the claim for relief." (Emphasis added.) The statute does not specify standards for documentary evidence. *State v. Wright*, 2023-Ohio-2895, ¶ 142 (2d Dist.). However, as a general rule, a party must properly authenticate documentary evidence as a prerequisite to admissibility, pursuant to Evid.R. 901(A). The rule provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence

48.

sufficient to support a finding that the matter in question is what its proponent claims."
This is a "low threshold, which does not require conclusive proof of authenticity, but only
sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence]
is what its proponent claims it to be." (Citations omitted.) *Wright* at ¶ 142. For the
record, we note that Clinton laid no foundation that would allow a judicial finding that
the reams of paper included with his petition are what they are purported to be, i.e. news
articles about the crimes committed in this case and the state investigation of Clinton and
his eventual trial.

{¶ 101} We reviewed every single document. Of the approximately 150 articles
included by Clinton, roughly half were published *before* Clinton filed his change-of-
venue motion. Because these articles were available to Clinton and could have
supported his motion, we may not consider them. *State v. Bowman*, 2023-Ohio-2078, ¶
15 (2d Dist.), quoting *State v. Jackson*, 2007-Ohio-1474, ¶ 21 (10th Dist) ("For a
defendant to avoid dismissal of the petition by operation of res judicata, the evidence
supporting the claims in the petition * * * must not be evidence that existed or was
available for use at the time of trial. * * *."); *see also, State v. Cowan,* 1999 WL 699870
(12th Dist. Sept. 7, 1999) (Finding that, because jury questionnaire and newspaper
articles were part of the trial record and were considered in the trial court's decision,
petitioner's change-of-venue claim based on media publicity "could have been raised on
direct appeal and is barred by *res judicata."*).

49.

{¶ 102} This leaves the remaining articles, i.e. those that were published after the filing of Clinton's motion. Strictly speaking, those articles are not evidence of *pre*-trial publicity. Further, merely presenting evidence outside the record does not automatically defeat the doctrine of res judicata." *Spaulding* at ¶ 11. Rather, the evidence must meet some "threshold standard of cogency." *Coleman* at *7. Cogent evidence is evidence that is more than "marginally significant" and that advances a claim "beyond mere hypothesis and a desire for further discovery." *State v. Hill,* 1998 WL 320917, *1 (1st Dist. June 19, 1998). Here, Clinton refers to the purported articles "en masse," without any particular reference, to any particular article. *Accord Grate,* 2023-Ohio-2103, at ¶ 75. (Finding that materials submitted in support of postconviction change-of-venue claim, which included a "volume of articles from the media regarding the incident" did not meet a threshold standard of cogency and are "merely cumulative of or alternative to evidence presented at trial and upon appeal.").

{¶ 103} Clinton also makes the same arguments in post-conviction as he did in his direct appeal, i.e. that he was "regularly in the news" and that there was "voluminous" and "continuing coverage" of the murders and his trial. But, "[r]es judicata * * * implicitly bars a petitioner from 'repackaging' evidence or issues which either were, or could have been, raised, in the context of the petitioner's trial or direct appeal." (Quotation omitted.) *State v. Bowman*, 2023-Ohio-2078, ¶ 15 (2d Dist.). To overcome the res judicata bar, the petitioner must produce *new* evidence that renders the judgment void or voidable and must show that he could not have appealed the claims based upon

50.

information contained in the original record.  We find that Clinton has failed to produce any *new* evidence establishing that the pretrial publicity in this case was so "extreme," that a fair trial could not be achieved in Erie County.  *Skilling v. United States*, 561 U.S. 358, 381 (2010).  We affirm the trial court's dismissal of G/R 48 without a hearing.

### B. Failure to "admonish jurors" and to dismiss "entire first panel of jurors"—G/R No. 63 and 64

{¶ 104} Clinton's sixth assignment of error also includes a challenge to the dismissal of claims asserting that his right to a fair trial was violated when the trial court failed to dismiss the entire first panel of jurors, who were "infected with outside information," and when it failed to "admonish jurors not to speak about what they heard." *See* G/R Nos. 63 and 64.  In support of his claims, Clinton relied upon the affidavit of his defense investigator and two academic articles from *Psychology, Public Policy, and Law*. (Exs. 51, 76 and 77).

{¶ 105} The trial court denied the claims on res judicata grounds, finding that "the matter of pre-trial publicity was expressly raised on direct appeal" and that "none of the evidence *dehors* the record * * * would have had any material effect on the propriety of the adjudication of [these claims] by the Ohio Supreme Court."  J.E. at 9.

{¶ 106} Indeed, Clinton raised several "juror-bias claims" on direct appeal, all of which the Ohio Supreme Court denied.  *See Clinton,* 2017-Ohio-9423 at ¶ 70-93.  In finding that no error occurred, the court found that Clinton "cites nothing in the record to demonstrate that these [juror] remarks biased or prejudiced the empaneled jurors.

51.

Generally, prejudicial effect is not presumed but must be affirmatively shown on the record." *Id.,* citing *State v. Treesh,* 90 Ohio St.3d 460, 464 (2001).

{¶ 107} Clinton repeats, nearly verbatim, many of his claims in post-conviction, including that Juror No. 363 tainted the jury pool by stating "multiple times that * * * Clinton had * * * admitted he was guilty, which was untrue" and that the trial court "continually forgot" to instruct jurors not to discuss the case. *See* Petition at ¶ 546. Clinton maintains that his claims are not precluded by operation of res judicata, because they are supported by two academic articles from *Psychology, Public Policy, and Law:* "The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases," from 2018 *and* "Your Bias is Rubbing Off on Me: The Impact of Pretrial Publicity and Jury Type on Guilt Decisions, Trial Evidence Interpretation, and Impression Formation," from 2020. (PCR Exhibits 76 and 77). Clinton argues that these "[s]tudies show that exposure to biased media coverage had a prejudicial impact on juror attitudes toward criminal defendants."

{¶ 108} We find that the articles do not constitute "competent evidence" and therefore res judicata applies. "Outside materials submitted in support of a postconviction relief petition must adhere to the rules of evidence; unreliable documents are not sufficient." *State v. Belton*, 2023-Ohio-294, ¶ 63 (6th Dist.), citing *State v. Harris*, 2008-Ohio-934, ¶ 38 (8th Dist.). "Because works of professional literature contain statements that if introduced as evidence would fall within the definition of hearsay, and because the Ohio Rules of Evidence … do not contain a learned-treatise

52.

exception to the hearsay rule, … such works are inadmissible as independent evidence of the theories and opinions therein expressed." (Quotation omitted.) *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 23. While Ohio now has a learned-treatise exception in Evid.R. 803(18), this rule only provides an exception to the hearsay rule when the learned treatise is "called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination." As provided in the comments to Evid.R. 803, "statements in learned treatises come to the trier of fact only through the testimony of qualified experts who are on the stand to explain and apply the material in the treatise." Here, the articles at issue are not relied upon by any expert. Therefore, they are hearsay and do not constitute competent evidence sufficient to overcome res judicata. *Accord Belton* at ¶ 64 (Rejecting academic article, *The Adolescent Brain,* for same reason).

{¶ 109} Because the claims set forth in G/R Nos. 63 and 64 were raised at trial and direct appeal and because Clinton failed to present competent evidence outside of the record, we find the trial court did not err in finding that these grounds for relief were barred by the doctrine of res judicata.

{¶ 110} We affirm the trial court's dismissal of G/R No. 48 (venue) and G/R Nos. 63 and 64 (juror claims) without a hearing, and we find Clinton's sixth assignment of error not well-taken.

53.

### C. Failure to conduct voir dire on the issue of race — <u>G/R No. 65</u>

**{¶ 111}** Clinton claims that inadequate voir dire on the subject of race deprived him of his right to a fair trial *and* to effective assistance of counsel. *See* G/R No. 65. Although a two-pronged claim, Clinton's arguments focus primarily on the ineffective assistance claim, which we addressed at ¶ 45. As for his due process claim, Clinton argued only that a trial court is "obligat[ed] to impanel an impartial jury," which includes the duty to "identify unqualified jurors" and that the court "did nothing" in this case to ensure that the jurors were "free from racial bias." Clinton is African-American.

**{¶ 112}** Clinton made the same argument in his direct appeal, which the Ohio Supreme Court denied, finding that because "Clinton did not request voir dire on the subject of racial prejudice, * * * the trial court did not err by failing to inquire about the subject of race." *Id.* at ¶ 163, citing *Turner v. Murray*, 476 U.S. 28, 37 (1986) (Noting that a "capital defendant accused of an interracial crime is entitled to have prospective jurors * * * questioned on the issue of racial bias," but that "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.").

**{¶ 113}** Clinton insists that his claim in postconviction is not precluded because it is supported by evidence outside the record that "explain[s] how crucial it is to voir dire on race when a Black defendant is accused of violent crime against white victims." The evidence in question refers to an affidavit from Gregory Meyers, Esq. who is employed by the Office of the Ohio Public Defender and has served as chief counsel for the death

54.

penalty division of that office. In Meyers' opinion, defense counsel's voir dire was "woefully inadequate." First, Meyer's opinion pertains to trial counsel's performance only, not the trial court's. Further, even if true, it would not yield a different result in postconviction, for the reason that Clinton did not request voir dire on the subject of racial prejudice. Therefore, there was no error by the trial court in failing to inquire on the subject of race. *Murray* at 37. Accordingly, we find that Meyers' affidavit is not cogent evidence, and that the trial court did not err in dismissing G/R No. 65 without a hearing. We find Clinton's seventh assignment of error is without merit.

### D. Failure to exclude Clinton's "involuntary statement" as evidence at trial— G/R No. 28

{¶ 114} In his tenth assignment of error, Clinton alleges that the trial court abused its discretion when it failed to grant him a hearing on the issue of whether his right to a fair trial was violated when his "involuntary statement" to police—after his attempted suicide and release from the hospital—was admitted at trial. *See* G/R No. 28. The same allegations and postconviction evidence that support this claim also support his ineffective assistance of counsel claim, which we addressed at ¶ 67-78. Briefly though, Clinton alleges that, during his police interview, he remained so "weak" and "confused" from his overdose two days before, that his statement to police should have been deemed "involuntary" and therefore inadmissible.

{¶ 115} The trial court found the ineffective assistance and due process claims barred by res judicata because, in its words, the claims "could have been, but [were] not, raised during the trial." J.E. at 7-8. Earlier in this opinion, we found that, because

55.

Clinton's ineffective assistance of counsel claim was supported by evidence outside the record, res judicata did *not* apply, and we have remanded G/R No. 29 for a hearing. On the other hand, the exception to res judicata—that applies to some postconviction claims of ineffective assistance of counsel—does *not* apply to those due process claims that rely on evidence that was known to the defense at the time of trial and could have been fully litigated at that time. *Blanton,* 2022-Ohio-3985, at ¶ 94 ("Because the basis for Blanton's due-process claim was known to him at the time of trial and could have been fully litigated at that time, the claim is barred by res judicata."). In this case, because the basis for Clinton's due process claim was known and available to him and could have been fully litigated, it is barred by res judicata. Therefore, we affirm the trial court's dismissal of G/R No. 28 without a hearing, and find Clinton's tenth assignment of error not well-taken.

### E. Consumption of DNA and State's failure to comply with DNA court order—<u>G/R No. 26</u>

{¶ 116} In his eighth assignment of error, Clinton alleges that the trial court erred in dismissing his claim that his due process rights, as those rights pertain to DNA evidence, were violated when, at trial, the court failed to enforce a discovery order regarding "DNA procedures" and when the state failed to notify defense counsel that DNA samples would be consumed. *See* G/R No. 26. This ground for relief also includes an ineffective assistance claim for counsel's failure to challenge the state's noncompliance with the DNA court order, which we addressed at ¶ 43.

56.

{¶ 117} On appeal, Clinton complains that the trial court "never ruled on [his] due process [claims]," and we agree. As we indicated previously, "[g]iven the lack of any reference in the judgment to the DNA court order or the consumption of DNA, we find that the trial court did *not* make any findings [or conclusions] with regard to G/R No. 26." *See ¶* at 43. Therefore, we remand for findings and conclusions as to Clinton's due process argument raised in G/R No. 26, in addition to his ineffective assistance of trial counsel argument. On this limited basis, we find Clinton's eighth assignment of error well-taken.

### F. Chain of custody of DNA and other evidence—G/R No. 62

{¶ 118} In his ninth assignment of error, Clinton alleges that the trial court abused its discretion in denying him a hearing as to his claim that his due process rights were violated at trial when the court allowed the state to present evidence with a broken or undocumented chain of custody, specifically (1) DNA evidence taken from "swabbings" of the three deceased victims and of the ligatures and (2) "other evidence collected at the scene." (G/R No. 62). Clinton also argued, within this ground for relief, that his counsel was ineffective for failing to ensure that the chain-of-custody of all admitted crime scene evidence was not broken, undocumented or unproven. We have found that the court's findings and conclusions were limited to "crime scene" evidence only and failed to include findings or conclusions relative to swabbings or other DNA evidence. *See ¶* 44. Given the absence of such findings or conclusions, we remand as to Clinton's due process argument also. That is, the trial court shall issue findings of fact and conclusion

57.

of law with respect to the chain of custody of DNA evidence in the context of Clinton's due process claim.  On this limited basis, we find Clinton's ninth assignment of error well-taken.

### G. Cumulative errors—G/R No. 30, 47, 53, and 67

{¶ 119} Clinton challenges the trial court's dismissal of multiple postconviction claims of cumulative error.  Specifically, Clinton argued in his petition that,

- the cumulative effect of the state's "investigative errors and actions" deprived him of his right to due process (set forth in G/R No. 67 and raised on appeal in Assignment of Error No. 11); and that

- the cumulative effect of the denial of his right to effective assistance of counsel, at trial and during mitigation, deprived him of his right to counsel, among other constitutional rights (set forth in G/R Nos. 30 and 47 and raised on appeal in Assignments of Error Nos. 4 and 5, respectively); and that

- the cumulative effect of all "errors and omissions" deprived him of his right to a fair trial (set forth in G/R No. 53 and raised on appeal in Assignment of Error No. 14).

{¶ 120} Under the cumulative error doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Hunter*, 2011-Ohio-6524, ¶ 132; *State v. Garner*, 74 Ohio St.3d 49, 64

58.

(1995).  However, the doctrine is inapplicable when the alleged errors are found to be harmless or nonexistent. *Id.*; *State v. Brown*, 2003-Ohio-5059, ¶ 48.

{¶ 121} The trial court considered all claims of cumulative error together, dismissing them without a hearing on the basis that "[w]here none of Clinton's claims show error, and where none of Clintons' claims show "harmless error," the "doctrine of cumulative error" does not apply."  J.E. at 6.

{¶ 122} In light of our reversal of the trial court's judgment with respect to Clinton's *Brady* claims, claims involving DNA evidence and many claims of ineffective assistance of counsel claims, we find that the issues raised by Clinton on appeal, pertaining to his cumulative error claims, are moot.  *Accord State v. Lavender,* 2024-Ohio-229, ¶ 37 (1st Dist.), citing *State v. Ibrahim*, 2014-Ohio-5307, ¶ 37 (10th Dist.) (Finding issue on appeal, asserting that cumulative effect of errors at trial warranted a hearing, was moot given the court of appeal's reversal of trial court's decision as to underlying claims).  The trial court shall reconsider Clinton's claims of cumulative error, once it resolves the underlying claims on remand.

### H.  Clinton's absence from hearing involving the presentation of mitigation evidence—<u>G/R No. 32 and 34</u>

{¶ 123} In his twelfth assignment of error, Clinton alleges that the trial court abused its discretion by denying postconviction claims asserting that his right to due process was violated when, at trial, the court allowed defense counsel "to waive" Clinton's right to offer evidence in mitigation (G/R No. 32), at a hearing without Clinton in attendance (G/R No. 34).

59.

{¶ 124} Clinton raised these precise claims in his direct appeal, which the Ohio

Supreme Court rejected. In its words, Clinton "argue[d] that he had to personally waive

his presence at [the hearing where the waiver of mitigating evidence was addressed], *but

he is incorrect.* * * * [D]uring earlier proceedings, Clinton and defense counsel informed

the court that he did not want to attend all the hearings and conferences. Thus, Clinton's

absence was consistent with his stated wishes." (Emphasis added.) *Clinton,* 2017-Ohio-

9423, at ¶ 210 citing *State v. Gagnon,* 470 U.S. 522, 528 (1985) (Trial court "need not get

an express 'on the record' waiver from the defendant for every trial conference which a

defendant may have a right to attend."). Significantly, the court also found that Clinton

did *not* waive his right to present mitigation evidence because he "did in fact present

mitigating evidence [consisting of] his * * * lengthy unsworn statement." *Id.* at ¶ 195-

196. It explained that, rather than waive the presentation of mitigating evidence, Clinton

merely limited the scope of the evidence by "instruct[ing] his counsel not to present any

mitigating evidence *on his behalf.*" (Emphasis added.) *Id.* at ¶ 195. The court also

specifically rejected Clinton's claim that the unsworn statement "contained nothing that

was mitigating." It described the mitigating evidence, set forth in Clinton's statement, as

follows: "[Clinton] explained his behavior on the night of the murders, his prior

relationship with Jackson and her children, the depression he experienced, and the jobs he

had held and lost." *Id.* at ¶ 196. Finally, the court found that the presentation of

Clinton's statement obviated the need to conduct an inquiry under *State v. Ashworth*, 85

Ohio St.3d 56 (1999), paragraph one of the syllabus ("In a capital case, when a defendant

60.

wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary."). *Clinton* at ¶ 193. The court specifically found that the trial court did not err in not conducting an *Ashworth* inquiry, in light of the presentation of his statement.

{¶ 125} In support of his postconviction claims, which are verbatim as those raised in his direct appeal, Clinton relies upon his own affidavit and the affidavit from his defense investigator who interviewed one of the jurors. The trial court found that the evidence was insufficient to overcome the *res judicata* bar. J.E. at 8.

{¶ 126} On appeal, Clinton challenges the applicability of res judicata and points to his affidavit testimony, in which he asserts that the reason he "did not want to present mitigation [was] because [he] didn't understand the process" or "how appeals work." Clinton argues that such evidence casts "serious doubts on whether he understood the ramifications on his mitigation waiver."

{¶ 127} The evidence in the record does not support the contentions set forth in Clinton's affidavit. First, Clinton was evaluated by his own defense neuropsychologist, Dr. Galit Askenazi, who conducted a competency evaluation. Based on her findings, Dr. Askenazi opined "with reasonable psychological certainty, that Mr. Clinton is able to understand[] the nature and objectives of the mitigation phase and to knowingly choose to waive mitigation at the present time." The record also includes defense counsel's assessment that Clinton's "knowledge of the penalty phase is probably better than a lot of lawyers in the state at this time." In fact, trial counsel told the court that Clinton's motive

61.

for prohibiting the presentation of any other mitigation evidence was because Clinton "hop[ed] to get the death penalty" because he "believes he will be much safer on death row than [in with the] general population." *Clinton* at ¶ 41. In postconviction, Clinton reaffirmed that he was "afraid to be in the general population [of prison]."

{¶ 128} "Evidence outside the record alone will not guarantee the right to an evidentiary hearing." *State v. Curtis,* 2018-Ohio-2822, ¶ 24 (5th Dist). A defendant advancing a post-conviction petition is required to present evidence which meets a minimum level of cogency to support his or her claims. *Id.* "A petitioner's self-serving affidavit generally does not meet his or her minimum level of cogency." *Id.*, citing *State v. Kapper*, 5 Ohio St.3d 36 (1983); *State v. Moncrief*, 2008-Ohio-4594 (10th Dist.).

{¶ 129} Clinton also relies on an affidavit from his postconviction investigator who interviewed Juror No. 210 and averred that the jury "could not really consider" Clinton's unsworn statement because "it was not mitigation." We reject the argument. As discussed above, the Ohio Supreme Court specifically found that Clinton's statement constituted mitigating evidence.

{¶ 130} The affidavits, documentary evidence, files, and the records do not demonstrate that Clinton set forth sufficient operative facts to establish substantive grounds for relief. Accordingly, the trial court properly denied Clinton's petition for post-conviction relief without holding an evidentiary hearing, and we find that the trial court did not abuse its discretion in dismissing G/R Nos. 32 and 34 without a hearing. Clinton's twelfth assignment of error is found not well-taken.

62.

### I. Clinton's claim of actual innocence—<u>G/R No. 31</u>

{¶ 131} In his third assignment of error, Clinton argues that the trial court abused its discretion in denying his claim in postconviction that he is actually innocent of the offenses for which he was convicted and sentenced to death. *See* G/R No. 31.

{¶ 132} Clinton does not assert a claim of actual innocence based upon DNA evidence, under R.C. 2953.23(A)(1)(a)(iii). Rather, Clinton's claim is based upon his alternative suspects theories, i.e. that either Jackson's drug-dealing friends or her ex-boyfriend, Griggs, had both the motivation and the opportunity, i.e. by gaining access to Jackson's home through an open window "outside of the view of the [hospital] surveillance video." Clinton adds that "any number of [other] potential suspects … could have had a role in her murders." Appellant's brief at 110, citing G/R Nos. 1-27 "and attached exhibits."

{¶ 133} "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993), *accord State v. Apanovitch*, 2018-Ohio-4744, ¶ 26. *Herrera* has been interpreted to mean that "a petitioner [is] not entitled to post-conviction relief unless he [can] show[] a violation of rights that were constitutional in dimension, *which occurred at the time that the petitioner was tried and convicted*." (Emphasis added.) *State v. Willis,* 2016-Ohio-335, ¶ 15-17 (6th Dist.), citing *State v. Campbell*, 1997 WL 5182 (1st Dist. Jan. 8, 1997). In *Campbell,* the First Appellate District held that

63.

[N]ewly discovered evidence is, by definition, that "which the defendant could not with reasonable diligence have discovered and produced at trial." Crim.R. 33(A)(6); * * * A claim of actual innocence based on newly discovered evidence will, therefore, not provide substantive grounds for post-conviction relief, because "it does not, standing alone, demonstrate a constitutional violation in the proceedings that actually resulted in the conviction." * * * [Petitioner's] claims of actual innocence were thus not cognizable in a postconviction proceeding. *Id., citing State v. Powell*, 90 Ohio App.3d 260, 264, (1993).

{¶ 134} Here, Clinton's actual innocence claim is not predicated upon a constitutional violation *occurring at the time that he was tried and convicted*. Rather, he argues that, "[g]iven the evidence that has developed [in post-conviction]," a new trial may show that he is actually innocent. Clinton argues that, under these circumstances, "his convictions and death sentence *would violate* the Eight Amendment['s]" prohibition against cruel and unusual punishment. (Emphasis added.)

{¶ 135} Other Ohio courts have rejected claims of actual innocence under similar circumstances. *State v. Watson*, 126 Ohio App.3d 316, 323 (12th Dist.1998), (Rejecting "claimed constitutional violation that appellant was in prison for a crime he did not commit * * * violat[ive] [of] the Cruel and Unusual Punishment Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution."); *State v. Loza*, 1997 WL 634348 (12th Dist. Oct. 13, 1997)

64.

("[A]ctual innocence does not, standing alone, demonstrate a constitutional violation in the proceedings that actually resulted in the conviction."); *State v. Ayers*, 2022-Ohio-1910, ¶ 93-97 (5th Dist.); *State v. Williams*, 2022-Ohio-2043, ¶ 59 (8th Dist.) ("The statute refers only to DNA testing results, not general arguments of actual innocence. Further, a claim of actual innocence is not itself a constitutional claim, nor does it constitute a substantive ground for postconviction relief.").

{¶ 136} Because Clinton's actual innocence claim is based on newly discovered evidence, it is not a cognizable claim in a postconviction proceeding. Therefore, the trial court did not err in denying G/R No. 31, and Clinton's third assignment of error is found not well-taken.

### J. Compliance with R.C. 2929.11—G/R No. 51

{¶ 137} In his thirteenth assignment of error, Clinton argues that the trial court abused its discretion when it denied him relief on the ground that his due process rights were violated during sentencing when the court failed to follow Ohio sentencing law. *See* G/R No. 51. According to Clinton, the trial court "failed to weigh or even mention" the factors set forth in R.C. 2929.11(A), which provides that,

> A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court

65.

determines accomplish those purposes without imposing an unnecessary burden on state or local government resources.

{¶ 138} Clinton raised these same arguments in his direct appeal. In rejecting the claim, the Ohio Supreme Court said,

> Clinton claims that the trial court did not comply with R.C. 2929.11. The record belies this claim. Before pronouncing sentence, the trial court stated, "The Court will state for the record that it is cognizant of the overriding purposes and principles of felony sentencing here in Ohio. The Court does adhere to those purpose[s] and principles, as it must, pursuant to 2929.11(A), (B), and (C) of the Ohio Revised Code." *Clinton,* 2017-Ohio-9423, at ¶ 242.

{¶ 139} The Ohio Supreme Court also rejected Clinton's argument that the trial court "never made detailed findings" under R.C. 2929.11, noting that "a trial court 'fulfills its duty under the statutes by indicating that it has considered the relevant sentencing factors'" and that the court "'need not go through each factor on the record—it is sufficient that the court acknowledges that it has complied with its statutory duty to consider the factors without further elaboration.'" *Id.* at ¶ 243, quoting *State v. Smith*, 2014-Ohio-1520, ¶ 14 (8th Dist.).

{¶ 140} In postconviction, Clinton repeats his failing argument that the trial court "failed to follow" R.C. 2929.11(A) because neither the transcript nor the opinion "contemplate the purposes of felony sentencing." G/R No. 51. He insists that the death

66.

penalty places an unnecessary burden on state and local resources and that a sentence of "less than" death would have achieved the purposes of felony sentencing, i.e. it would have incapacitated him, deterred others and allowed rehabilitation to occur.  In support, Clinton included with his petition a number of reports, i.e. *Capital Crimes Annual Report* (2014) by the Ohio Attorney General; *Final Report to the General Assembly* (2008) by the Maryland Commission on Capital Punishment; and *Smart on Crime:  Reconsidering the Death Penalty in a Time of Economic Crisis* (2009), by the Death Penalty Information Center.  Clinton argues that the reports demonstrate that the death penalty is not the "minimum sanction" that would accomplish the purposes of R.C. 2929.11 due to the "significant * * * financial burden of the death penalty on government."  *See* Exs. 63A, 63B, and 63C.

{¶ 141} In its review, the trial court found Clinton's claim barred by res judicata because it was "expressly raised on direct appeal" and because none of the evidence included with the petition "would have had any material effect on the propriety of the adjudication of the claim by the Ohio Supreme Court."  J.E. at 8-9.

{¶ 142} Two of the articles were available to Clinton during his 2013 trial and therefore are res judicata.  *Bowman,* 2023-Ohio-2078, at ¶ 15 (2d Dist.).  Furthermore, none of the evidence alters the fact, as determined by the Ohio Supreme Court, that the trial court complied with R.C. 2929.11(A).  Moreover, the court has expressly found that "[i]n some cases, a sentencing court may determine that the death penalty *is,* in fact, 'the

67.

minimum sanction;' that will accomplish its purpose of 'punishing the offender.'"

(Emphasis added.) *State v. Belton,* 2016-Ohio-1581, ¶ 45-46 citing R.C. 2929.11(A).

{¶ 143} We find that G/R No. 51 is barred by res judicata because the evidence

dehors the record was either available at the time of trial or because it fails to demonstrate

that the trial court did not properly consider whether the burden imposed by the sentence

was unnecessary in the context of this case. Therefore, Clinton's complaint—that neither

the transcript nor the judgment entry contemplates the purposes of felony sentencing—

fails on its merits and is barred by res judicata. Clinton's arguments are also precluded

by *State v. Jones,* 2020-Ohio-6729, ¶ 42. ("Nothing in R.C. 2953.08(G)(2) permits an

appellate court to independently weigh the evidence in the record and substitute its

judgment for that of the trial court concerning the sentence that best reflects compliance

with R.C. 2929.11 and 2929.12. In particular, R.C. 2953.08(G)(2) does not permit an

appellate court to conduct a freestanding inquiry like the independent sentence evaluation

the Supreme Court must conduct under R.C. 2929.05(A) when reviewing a death-penalty

sentence."). For all of these reasons, we find Clinton's thirteenth assignment of error is

found not well-taken.

### K. Constitutionality of R.C. 2953.21(A)—<u>G/R No. 50</u>

{¶ 144} In his fifteenth assignment of error, Clinton alleges that the trial court

abused its discretion in failing to find Ohio's postconviction review statute, R.C.

2953.21(A), unconstitutional. Clinton alleges *in his brief* that he "supported this ground

of relief with evidence outside the trial record" but fails to identify what the alleged

68.

"evidence" is.   Appellant's brief at 124.  By contrast, Clinton's petition did *not* allege that his claim relied upon, or was supported by, any evidence dehors the record.  *See* G/R No. 50.

{¶ 145} We have previously rejected a constitutional challenge to R.C. 2953.21. *State v. Zich,* 2017-Ohio-414, ¶ 29 (6th Dist.)  ("In light of the considerable case law upholding the constitutionality of Ohio's postconviction procedure set forth in R.C. 2953.21, we find appellant's constitutional argument unavailing.")  Further, even if Clinton had raised a cognizable claim of a constitutional error, it would be barred res judicata.  "Under the doctrine of res judicata, constitutional issues cannot be considered in postconviction proceedings under R.C. 2953.21 et seq. where they have already been or could have already been litigated by the convicted defendant, while represented by counsel, either before conviction or on direct appeal."  *State v. Lott,* 2002-Ohio-6625, ¶ 19 *overruled on other grounds in State v. Ford,* 2019-Ohio-4539.  "Res judicata applies if the petition for post-conviction relief does not include any material dehors the record in support of the claim for relief." (Internal quotations and citations omitted.)  *State v. Kiley*, 2013-Ohio-634, ¶ 7, citing *State v. Fry,* 2012-Ohio-2602, ¶ 4 (9th Dist.).   Clinton's constitutional challenge could have been raised before the trial court and on direct appeal. For that reason, and because Clinton includes no evidence outside the record, his claim is barred by res judicata.

69.

{¶ 146} We find that the trial court did not abuse its discretion in dismissing Clinton's fiftieth ground for relief and that Clinton's fifteenth assignment of error is not well-taken.

## VIII. CLINTON'S DISCOVERY MOTIONS

{¶ 147} In Clinton's sixteenth—and final—assignment of error, he claims that he was entitled to conduct post-conviction discovery, pursuant to R.C. 2953.21(A)(1)(e) and Crim.R. 42(C), and that the trial court abused its discretion in denying his requests. We agree, in part.

### A. Discovery under R.C. 2953.21.

{¶ 148} On April 6, 2015, during post-conviction, Clinton moved the trial court for discovery from multiple agencies and individuals who were connected to the trial, mostly in the form of subpoenas duces tecum and depositions. The trial court denied the motion. Clinton promptly requested that the court "reconsider" its decision, in light of "new evidence," specifically a news article, appearing in the Washington Post on May 29, 2015. The article reported that the FBI had notified "crime labs across the country" that it had discovered errors in data used by forensic scientists to match DNA to a particular person. On June 26, 2015, the trial court denied Clinton's motion for reconsideration.

{¶ 149} At the time Clinton's motions were decided in 2015, "it was well established that the statutory scheme governing postconviction relief did not entitle a petitioner to conduct discovery." *State v. Myers*, 2021-Ohio-631, ¶ 35 (12th Dist.),

70.

citing *State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office*, 87 Ohio St.3d 158, 159 (1999) ("[T]here is no requirement of civil discovery in postconviction proceedings."); *see also State v. Taylor*, 2002-Ohio-2742, ¶ 19 (8th Dist.) (Courts are not required to provide petitioners discovery in postconviction proceedings.).  Nevertheless, discovery "could be proper" where a petitioner set forth operative facts outside the record that revealed a constitutional error in his case.  *Id.*  The granting or overruling of a discovery motion rested within the sound discretion of the trial court.  *Id.,* citing *State v. Lawson*, 2012-Ohio-548, ¶ 17 (12th Dist.).

{¶ 150} As previously discussed, R.C. 2953.21 was amended on April 16, 2017, and the amendments made "substantial changes regarding PCR petitions in death-penalty cases, and in particular, allow[ed] capital petitioners to obtain discovery in aid of their PCR petition if good cause is shown." *Myers* at ¶ 35 citing R.C. 2953.21(A)(1)(e).  That provision provides, in relevant part,

> At any time in conjunction with the filing of a petition for postconviction relief under division (A) of this section by a person who has been sentenced to death, or with the litigation of a petition so filed, the court, for good cause shown, may authorize the petitioner in seeking the postconviction relief and the prosecuting attorney of the county served by the court in defending the proceeding, to take depositions and to issue subpoenas and subpoenas duces tecum in accordance with divisions

71.

(A)(1)(e), (A)(1)(f), and (C) of this section, and to any other form of discovery as in a civil action that the court in its discretion permits.

{¶ 151} On appeal, Clinton argues that, under R.C. 2953.21(A)(1)(e), he "provided good cause for the discovery he requested in 2015 motions." [sic]. But the motions were filed, and decided, nearly two years *before* the amendment—authorizing discovery for "good cause"—was enacted. And, Clinton did not refile the motions, or request that the trial court reconsider its earlier orders, in light of the amendment. Clinton could have done so, inasmuch as the statute allows capital petitioners to obtain discovery, for good cause shown, "at any time in conjunction with the filing of a [PCR petition], *or with the litigation of a petition so filed*[.]" (Emphasis added.) R.C. 2953.21(A)(1)(e); *see, e.g. Myers* at ¶ 39 (finding that because the appellant's post-conviction petition was "still being litigated on April 6, 2017, when the amended statute became effective," it applied to his petition and specifically to his unresolved supplemental motion for discovery). Here, Clinton can hardly show that the trial court abused its discretion under R.C. 2953.21(A)(1)(e) when he never requested discovery under that provision.

{¶ 152} Even if we were to apply the amended provision to this case, we find no basis to conclude that good cause was shown. Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is * * * entitled to relief." *Id.* at ¶ 42, quoting *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997). Before determining whether a

72.

petitioner is entitled to discovery under the "good cause" standard, the court must first identify the essential elements of the claim on which discovery is sought. *Id.* at ¶ 43, citing *Bracy* at 904. The burden of demonstrating the materiality of the information requested is on the moving party. *Id.* Discovery may be allowed where the petitioner's claims are "neither patently frivolous nor palpably incredible" and where "the discovery he requests is specific, limited, and reasonably calculated to lead to evidence in support of his claim[.]" (Citation omitted.) *Id.* If the moving party meets its burden and establishes good cause, then "it is the duty of the [trial court] to provide the necessary facilities and procedures for an adequate inquiry."

{¶ 153} Clinton promulgated 26 discovery requests, designated as Requests "a" through "bb" in which he sought records and depositions of individuals, most of whom are unidentified by name, but rather by their title within a particular governmental agency, i.e. the Sandusky County Department of Children's Services. Thus, in eight requests, Clinton requested "records, deposition, or subpoena duces tecum of the entire [governmental agency's] file maintained and relating to the deaths of Heather Jackson, C.J., W.J. and the rape of E.S." The next eight requests sought to depose the "officers, investigators, and agents" of those agencies. Clinton also requested to depose "all seated jurors and alternate jurors," as well as his trial counsel, criminal investigator, and expert witness. In his final four requests, Clinton sought a "complete chain-of-custody and inventory of" of "all evidence collected from the investigation of the crime scene, * * *

73.

all DNA swabs, * * * evidence collected from Curtis Clinton's vehicle, * * * [and his] clothing and personal items."

{¶ 154} Missing from Clinton's requests is any showing of materiality. That is, Clinton failed to articulate how any of the requests relate to any particular postconviction claim. Instead, he argued, generally, that discovery was necessary "to uncover * * * relevant and material evidence that supports [his] grounds for relief." And, rather than identify operative facts outside of the record, he argued that discovery should be allowed so that he could "*develop* [facts] not within his control." (Emphasis added.) Under the prior or current standard, post-conviction discovery is not allowed for this purpose. We find that the discovery sought by Clinton in 2015 is overly broad and neither specific, nor limited, nor reasonably calculated to lead to evidence in support of his claims. Accordingly, we find that Clinton failed to establish that good cause exists for the information he seeks.

{¶ 155} Likewise, Clinton's inclusion of a news article from *The Washington Post* did not raise a colorable claim that the DNA analysis conducted *in his case* was "fraught with error." According to the article, "software programs" used by most, but not all, U.S. crime labs produced "errors in data" that scientists were reportedly using at the time to calculate the chances that DNA found at a crime scene "matched" a particular person. Importantly, there was no indication that BCI, the agency that analyzed DNA in this case, was one of the labs notified by the FBI. Moreover, the article specified that the purported "errors in data" were "*unlikely* to result in dramatic changes that would affect cases."

74.

(Emphasis added.) Therefore, we find that the article did not substantiate the need for discovery, as it relates to the DNA evidence analyzed in his case.

{¶ 156} A petitioner is not entitled to go on a fishing expedition based on conclusory allegations. "Even in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient grounds to warrant requiring the state to respond to discovery or to require an evidentiary hearing.'" *Stanford v. Parker,* 266 F.3d 442, 460 (6th Cir.2001), quoting *Zettlemoyer v. Fulcomer,* 923 F.2d 284, 301 (3d Cir.1991). Given Clinton's failure to identify specific operative facts that, if proved, would establish constitutional error, we cannot say that the trial court abused its discretion in denying his 2015 motion for discovery.

**B. Discovery under Crim.R. 42(C).**

{¶ 157} Clinton also pursued discovery from the prosecution in May of 2018, when he requested access to all evidence allowed under Crim.R. 42(C). Generally, that rule authorizes "full and complete access to all documents, statements, writings, photographs, recordings, evidence, reports, or any other file material." Through correspondence with the prosecutor, Clinton's postconviction counsel requested to "examine" the state's file, in the location where it was housed. The state responded that "the Crim.R. 42 materials"—which it defined as materials from October 9, 2012 through December 13, 2013—had already been provided. By motion, Clinton then requested that the trial court enforce Crim.R. 42(C) and indicated that "every effort [had been made] to get the requested discovery without involving this court." The state objected, and the

75.

trial court denied Clinton's Crim.R. 42 motion, finding that "no further discovery needs to take place."

{¶ 158} Crim.R. 42 ("Capital cases and post-conviction review of capital cases") was adopted by the Ohio Supreme Court on July 1, 2017. The rule provides, in relevant part:

**(A) Definitions.** As used in this rule:

(1) "Capital cases" means all cases in which an indictment or count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in R.C. 2929.03(A).

(2) "Post-conviction review of a capital case" means any post-conviction proceedings reviewing the conviction or sentence in any case in which the death penalty has been imposed, other than direct appeal to the Supreme Court of Ohio.

**(B) General.**

(1) This rule shall apply to all capital cases and post-conviction review of a capital case.

(2) The clerk shall accept for filing, and the court shall rule on, any properly presented motion.

(3) In all proceedings involving a post-conviction review of a capital case, both of the following shall apply:

76.

(a) The court shall state specifically why each claim was either denied or granted;

(b) There shall be no page limitations or word count limitations for the petition filed with the common pleas court.

(C) **Access File Material.** In a capital case and post-conviction review of a capital case, the prosecuting attorney and the defense attorney shall, upon request, be given full and complete access to all documents, statements, writings, photographs, recordings, evidence, reports, or any other file material in possession of the state related to the case, provided materials not subject to disclosure pursuant to Crim.R 16(J) shall not be subject to disclosure under this rule.[3]

{¶ 159} We review a trial court's order denying a Crim.R. 42 request for discovery for an abuse of discretion. *Powell*, at ¶ 48 (Reviewing a request for the appointment of an expert under Crim.R. 42(E)).

{¶ 160} The state denied Clinton's Crim.R. 42(C) request on the basis that it had already "provided" all discovery materials to which he was entitled, under Crim.R. 16, during the trial, i.e. from October, 2012 to December, 2013. The fact that the state may

---

[33] Clinton's postconviction proceeding was already pending at the time Crim.R. 42 took effect on July 1, 2017. We note that the state does not dispute the applicability of the then-newly amended rule to Clinton's motion, which he filed on May 18, 2018. *See* Crim.R. 59(ee) regarding the "Effective date" of Crim.R. 42; *see also State v. Powell, 2019-Ohio-4286, ¶ 19, fn.1 (6th Dist.).*

77.

have fully complied with its discovery obligation during the trial phase, under Crim.R. 16, is not germane to the issue of its compliance during postconviction review under Crim.R. 42. Indeed, Crim.R. 42(C) provides "access" to discovery materials, and the rule applies "to all * * * postconviction reviews of capital murder cases." *State ex rel Swopes v. McCormick,* 2022-Ohio-306, ¶ 12 (8th Dist.). We further reject the state's current argument, that it had no duty to respond to Clinton's "supposed discovery request under Crim.R. 42" because "there was no *new* material to disclose." (Emphasis added.) *See Appellee's Brief* at 32. The state cites no authority in support of its position, and we are aware no such authority either. Moreover, while there is little case law interpreting Crim.R. 42 and specifically Crim.R. 42(C), we agree with the observations made by the Eleventh District in *State v. Noling*, 2022-Ohio-759, ¶ 22 (11th Dist.). Although the petitioner's Crim.R. 42(C)'s requests in that case were "not directly at issue in [the] appeal," the court of appeals remarked that the trial court had "without clear justification or rationale denied appellant's previous Crim.R. 42(C) motion for access," notwithstanding that it "appears Crim.R. 42(C) mandates the relief appellant sought in his initial motions." *Id.* And, it expressed skepticism for the trial court's "under-analyzed" decision to deny petitioner's motions. *Id.*

{¶ 161} The same may be said in here. That is, the trial court offered no explanation for its refusal to enforce Clinton's request under Crim.R. 42(C), other than to state that "no further discovery needs to take place." Unlike a request for discovery under R.C. 2953.21(A)(1)(e), Clinton did not need to establish "good cause" in order to

78.

"access" file materials. We find that the trial court abused its discretion in denying Clinton's request under Crim.R. 42(C). On that limited basis, we find his sixteenth assignment of error well-taken.

{¶ 162} Crim.R. 42 allows the "prosecuting attorney and the defense attorney" to access file materials "*in possession of the state* related to the case." (Emphasis added.) We note that Clinton's request for access was limited to the Erie County Prosecutor. Therefore, on remand, the prosecutor shall provide access to the materials described in the rule, subject to materials that would otherwise not be subject to disclosure under Crim.R. 16(J). In sum, we find Clinton's sixteenth assignment of error well-taken, in part and as set forth above.

## IX. CONCLUSION

{¶ 163} The October 26, 2021 judgment of the Erie County Court of Common Pleas is reversed in part and affirmed in part. We find Clinton's third, sixth, seventh, tenth, twelfth, thirteenth, and fifteenth assignments of error not well-taken, and we affirm the trial court's judgment that dismissed the grounds for relief, without a hearing, that are the subjects of those assignments of error.

{¶ 164} We find the remaining assignments of error well-taken in part and as set forth herein, specifically the first, second, fourth, fifth, eighth, ninth, eleventh, fourteenth, and sixteenth assignments of error, and we remand them, consistent with this opinion, for purposes of discovery pursuant to Crim.R. 42(C), for issuance of findings of fact and conclusions of law, and/or for a hearing.

79.

**{¶ 165}** The parties are ordered to share in the cost of this appeal, pursuant to App.R. 24.  It is so ordered.

Judgment affirmed, in part,
reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                       _____

Christine E. Mayle, J.                         JUDGE

                                           _____

Gene A. Zmuda, J.                           JUDGE
CONCUR.

                                           _____

                                           JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.